## SIMKINS INDUSTRIES, INC. *v.* LEXINGTON INSURANCE COMPANY ET AL.

[No. 735, September Term, 1978.]

*Decided May 9, 1979.*

The cause was argued before MORTON, THOMPSON and LOWE, JJ.

*David F. Albright* and *Benjamin R. Goertemiller,* with whom were *Christopher R. West* and *Semmes, Bowen & Semmes* on the brief, for appellant.

*Nevett Steele, Jr.,* with whom were *Wilbur D. Preston, Jr., Ward B. Coe, III, Gerson B. Mehlman* and *Whiteford, Taylor, Preston, Trimble & Johnston* on the brief, for appellee Lexington Insurance Company. *Douglas G. Worrall,* with whom were *William B. Somerville* and *Smith, Somerville & Case* on the brief, for appellee Continental Casualty Company. *Richard H. Lerch,* with whom were *Lerch & Huesman* on the brief, for appellee Hartford Steam Boiler Insurance and Inspection Company.

THOMPSON, J., delivered the opinion of the Court.

Simkins Industries, Inc. filed suit against Lexington Insurance Company, Continental Casualty Company, and Hartford Steam Boiler Insurance and Inspection Company to recover from those companies certain damages alleged to have been caused by a flood of its properties and allegedly covered by separate insurance policies issued by each of the companies. At the conclusion of the plaintiff's case in the

Circuit Court for Baltimore County, the trial judge granted each of the insurance companies' motions for directed verdicts. Simkins appeals alleging that it proved damages which were covered by the policies. We shall affirm as to Lexington and Continental but reverse as to Hartford.

In order to appreciate the arguments it is necessary that we make a brief statement of facts. In June 1972 a tropical storm named Agnes occurred within the Patapsco River basin with precipitation measuring up to fourteen inches. As a result of this rain, the Patapsco River flooded much beyond prior floods. The flood caused substantial damage to Simkins' plants; which consisted of a power plant on the Howard County side of the river containing a boiler, generator, turbine, and other electrical equipment and a large manufacturing complex on the Baltimore County side of the river containing two large papermaking machines and many motors, generators, pulpers, and other related equipment. Prior to Agnes, all of the equipment in the plant was in good condition.

The primary function of the power plant was to generate steam which was used first to run the turbine; it was then piped across the Patapsco River to the manufacturing plant where it was used to operate the papermaking machines and to heat the plant facilities. The steam crossed above the river on a steel truss bridge in a 12″ steel pipe. Also crossing the river on the bridge was a 4″ steel condensate pipe which returned the steam and condensate to the boiler. On either side of the river, these pipes entered the buildings through holes in the walls.

The plant was shut down and all electric power extinguished around midnight, June 21 and 22, 1972, the night of the flood. David Garrity, the plant manager, and several other workmen remained on the upper levels of the plant throughout the night. Armed with flashlights, they periodically inspected the water height and checked to ensure that no fires broke out. During the period following 1:00 a.m., Garrity was stationed at an upper level door on the river side of the manufacturing plant from which he could observe the river directly outside and the pipe bridge about 100 feet away.

Garrity saw two large trees bearing down on the bridge. By this time, the river level had risen to the bottom of the pipes. When these trees hit the bridge and the pipes he saw the building wall near him, through which the pipes entered the building, start to collapse, and he quickly retreated into the building. Fifteen minutes later, he returned to his observation post and observed the destruction. The pipes and conduit crossing the river had disappeared along with the bridge. The wall through which the steel pipes had entered the manufacturing plant had been completely torn away. In addition, the river side wall of the power plant had been ripped away. Flooding at the plant site was so common that a "flood drill" had been organized and had been utilized on a number of occasions. The plant had suffered flood damage prior to Agnes and was shut down for a six-week period in 1975 as a result of another flood associated with a hurricane. The evidence is clear, however, that the flood caused by Agnes was the worst to hit that area since records have been kept.

There were in effect at the time of the flood three separate policies of insurance issued by Lexington, Continental, and Hartford. As we have stated, the trial judge granted the motions of Lexington and Continental for directed verdicts on the grounds that the policies did not insure against the loss sustained. The court directed a verdict in favor of Hartford on the ground that the proof was insufficient to show that Simkins' losses were "solely due to" the peril insured against.

I Lexington and Continental

Lexington and Continental issued named peril policies, as opposed to all risk policies, to the appellant. On the first page [1] it was provided:

"INSURANCE IS PROVIDED AGAINST ONLY THOSE PERILS ... INDICATED BELOW BY A PREMIUM CHARGE AND AGAINST OTHER PERILS ... ONLY WHEN ENDORSED HEREON OR ADDED HERETO."

1. The essential terms of the Lexington and Continental policies were, for purposes of this case, identical. For convenience we shall refer to specific provisions from the Lexington policy but our discussion applies with equal force to the Continental contract.

Below that language, the following table appears:

| "AMOUNT | RATE | PREPAID TERM PREMIUM DUE AT INCEPTION | ANNUAL PAYMENT DUE UNDER PREM. PAY. PLAN | PERIL(s) Insured Against & Coverage(s) Provided (Insert Name of Each) |
|---|---|---|---|---|
| $2,500,000.00 | | | | |
| | .225 | $41,978.00 | $ | Fire & Lightning |
| | | $Incl. | $ | Extended Coverage |
| | | $Incl. | $ | VMM |
| | | $Incl. | $ | Sprinkler Leakage |
| | Total(s) | $41,978.00 | $ | " |

All of the covered perils are enumerated in Section II of the policy. They are:

1) Fire; 2) Lightning; 3) Wind or Hail; 4) Sprinkler Leakage; 5) Explosion; 6) Riot, Civil Commotion, Vandalism, Malicious Mischief; 7) Acts of the civil authority to prevent the spread of fire; 8) Impact of vehicles; 9) Impact of aircraft; 10) Sonic Boom; 11) Smoke; 12) Molten Materials.

Section I contains exclusions as follows:

"This Policy does not cover loss or damage:
****
Resulting from flood or the release of water from natural or man-made bodies of water, whether or not caused by or contributed to by an insured peril. However, liability is specifically assumed for loss or damage by fire, sprinkler leakage, explosion, or accident, all as defined and limited elsewhere in this Policy, resulting from flood or the release of water from natural or man-made bodies of water. For the purpose of this Policy, flood includes but is not limited to tidal wave, wave wash, high water, or overflow, surface or rising water, all whether or not driven by wind."

To support its contention that the policies provided

coverage for the losses incurred during the flood here in question, appellant relies upon a weak reed, that is, the language of the exclusionary clause quoted above which, after excluding loss or damage from flood, said, "liability is specifically assumed for loss or damage by fire, sprinkler leakage, explosion, or accident, all as defined and limited elsewhere in this Policy, resulting from flood. . . ."

It is settled in Maryland law that absent ambiguity the construction of an insurance contract is a matter of law for the court. *Government Employees Insurance Company v. DeJames,* 256 Md. 717, 720, 261 A. 2d 747 (1970). *See also, Winterwerp v. Allstate Insurance Co.,* 277 Md. 714, 717, 357 A. 2d 350 (1976) and *Keyworth v. Industrial Sales,* 241 Md. 453, 456, 217 A. 2d 253 (1966). The standard for interpretation in Maryland is somewhat different from that of many other states. The Court of Appeals set it out in *Government Employees Insurance Company v. DeJames, supra*:

"It is well settled that in interpreting insurance contracts, words are to be given their customary and normal meaning. *State Farm Mut. Auto Ins. Co. v. Treas,* 254 Md. 615, 255 A. 2d 296 (1969); *American Home Assurance Co. v. Erie Ins. Exchange,* 252 Md. 116, 248 A. 2d 887 (1969); *Offutt v. Liberty Mut. Ins. Co.,* 251 Md. 262, 247 A. 2d 272 (1968); *Harleysville Mut. Cas. Co. v. Harris & Brooks, Inc.,* 248 Md. 148, 151, 235 A. 2d 556 (1967), and cases there cited. Absent ambiguity the construction of the contract remains within the province of the court and Maryland has not adopted the rule, followed in many jurisdictions, that an insurance policy is to be most strongly construed against the insurer, *American Cas. Co. v. Aetna Cas. & Surety Co.,* 251 Md. 677, 248 A. 2d 487 (1968); *Mateer v. Reliance Ins. Co.,* 247 Md. 643, 233 A. 2d 797 (1967); *Ebert v. Millers Mut. Fire Ins. Co.,* 220 Md. 602, 155 A. 2d 484 (1959). If the language of an insurance contract is ambiguous, however, construction is for the jury, *Ebert v. Millers Mut. Fire Ins. Co., supra,* 220 Md. at 610; *Eagle Star & British Dominions Ins. Co. v.*

*Fleischman,* 175 Md. 433, 2 A. 2d 424 (1938); 22 Appleman, *Insurance Law and Practice* § 12853 (1947) at 7, and the ambiguity is to be resolved against the company which prepared the policy and in favor of the insured, *American Cas. Co. v. Aetna Cas. & Surety Co., supra,* 251 Md. at 684; *Allstate Ins. Co. v. Humphrey,* 246 Md. 492, 496, 229 A. 2d 70 (1967)." 256 Md. at 720.

We see no ambiguity in the present case within the meaning of the rule that an ambiguous contract must be submitted to the jury for determination.

Appellant argues that the policy does not define the word accident and, therefore, the word should be given its customary and normal meaning, citing *Harleysville Mutual Casualty Co. v. Harris & Brooks, Inc.,* 248 Md. 148, 235 A. 2d 556 (1967). In that case, the Court of Appeals quoted the definition of accident found in *Webster's Twentieth Century Dictionary* (1950), as follows:

"A happening; an event that takes place without one's foresight or expectation; an event which proceeds from an unknown cause, or is an unusual effect of a known cause, and therefore not expected. . . ." *Harleysville, supra* at 151.

From that premise appellant concludes that the unprecedented destruction of its property resulting from the largest flood to occur in that area, at least since records have been kept, constituted an "accident" resulting from a flood and was therefore within the coverage of the policy.

Appellant cites several cases for the proposition that damage caused by unexpected weather conditions is covered by an insurance policy providing for "accidents." *City of Aurora, Colorado v. Trinity Universal Insurance Co.,* 326 F. 2d 905 (10th Cir. 1964); *Baker v. American Insurance Co. of Newark, New Jersey,* 324 F. 2d 748 (4th Cir. 1963); *Albuquerque Gravel Products Co. v. American Employers Insurance Co.,* 282 F. 2d 218 (10th Cir. 1960); *Cornell Wood Products Co. v. Hartford Steam Boiler Inspection and*

*Insurance Co.,* 62 F. Supp. 303 (N.D. Ill. 1945); *Arthur A. Johnson Corp. v. Indemnity Insurance Co. of North America,* 7 N.Y.2d 222, 196 NYS 2d 678, 164 N.E.2d 704 (1959); *Hey v. Guarantors' Liability Indemnity Co. of Pennsylvania,* 181 Pa. 220, 37 A. 402 (1897). What appellant overlooks is that in every one of those cases the insurance policy clearly and specifically covered accidents in general and there was no exclusion of coverage for flood damage.

More appropriate to the resolution of the present case is the view expressed in 12 *Couch on Insurance,* § 44:416:

> "When a policy exception itself contains an 'exception' clause, the effect of the latter is to restrict the sphere of operation of the exception and thus make the exception inapplicable and allow recovery *if the harm sustained is otherwise within the coverage of the policy.*
>
> For example, an exception in an elevator accident insurance policy of accidents to persons making additions, alterations, or extraordinary repairs, except 'ordinary repairs,' means that anyone making ordinary repairs is covered by the policy the same as any person, *but his injuries are not covered, unless they occurred in a manner which would bring them within the risk insured against as outlined in other provisions of the policy."*[2] (Emphasis added.)

Applying this principle to the case at bar we see that the language upon which appellant relies is no more than an exception to the broad exclusion of flood damage from coverage under the policy. The "harm sustained," flood damage, was clearly not "otherwise within the coverage of the policy."[3]

2. Couch cites Lookaway Farm v. Caldwell Port Elevator, Inc., 260 La. 552, 256 So. 2d 623 and Dolph v. Maryland Casualty Co., 303 Mo. 534, 261 S.W.2d 330 (1924) to support his statements.

3. On the other hand, for example, had an explosion somehow occurred as the result of the flood, the damage caused by that explosion would be covered by virtue of the exception to the exclusion. We note that damage caused by explosion is "otherwise within the coverage of the policy."

Appellant correctly points out that in interpreting a contract a court will try to give effect to all of the agreement's provisions. *Sagner v. Glenangus Farms, Inc.,* 234 Md. 156, 157, 198 A. 2d 277 (1964); *Jeffrey Sneider-Maryland, Inc. v. LaVay,* 28 Md. App. 229, 240, 345 A. 2d 79, *cert. denied,* 276 Md. 746 (1975). The same authorities also hold that particular provisions of a contract are not to be read in isolation but rather the document is to be read as a whole to discover its true import. A further maxim of the law of contracts is that courts will attempt to reconcile apparently conflicting provisions in construing an agreement. *Chew v. DeVries,* 240 Md. 216, 213 A. 2d 742 (1965); *Mattingly Lumber Co. v. Equitable Building & Saving Ass'n.,* 176 Md. 403, 5 A. 2d 458 (1939). These principles, applied to the present case, dictate affirmance of the lower court's ruling with respect to Lexington and Continental.

To give the words "accident . . . resulting from flood" the effect urged upon us by appellant would contradict not only the specific exclusion within which the phrase appears but also the entire tenor of the policy. It is true that the magnitude of the flood occurring in this case was unexpected, but appellant in its reply brief specifically disclaims any argument that the flood itself was the accident and the phrase "accident . . . resulting from flood" does not mean that coverage is provided if the flood itself can somehow be characterized as an accident. Rather, the accident would have to have been an unforeseeable unexpected event, given the magnitude of the flood. As there was no evidence here that the damage done to appellant's plant was other than the expected result of a flood of that dimension, that damage was excluded from coverage under the policy.

Appellant next argues that the policy shows a premium was paid for "extended coverage" which it says includes an accident resulting from floods. We note that in the policy provisions all of the covered losses are specifically listed in Section II of the policy. An accident is not included therein but appellant argues that as extended coverage is not defined in the policy, under the Maryland cases the contract is ambiguous and thus its construction is for the jury. *Mateer*

*v. Reliance Insurance Co., Inc.,* 247 Md. 643, 233 A. 2d 797 (1967); *Government Employees Insurance Company v. DeJames, supra* and *Aetna Casualty & Surety Co. v. Brethren Mutual Insurance Co.,* 38 Md. App. 197, 379 A. 2d 1234 (1977). Citing *C & H Plumbing and Heating, Inc. v. Employers Mutual Casualty Co.,* 264 Md. 510, 287 A. 2d 238 (1972), it says that in determining whether the terms are ambiguous we must consider how the words would be understood by a reasonably prudent person applying for insurance, rather than from the view of a lawyer. Appellant then cites *Allstate Insurance Co. v. Humphrey,* 246 Md. 492, 229 A. 2d 70 (1967) for the proposition that inasmuch as insurance policies are prepared by insurance companies ambiguities should be construed against the company. We do not think that a layman would consider the policy ambiguous when the coverages for which the company paid a premium are specifically set out and do not include, other than in an exclusion clause, any language which would sustain the appellant's argument. In other words, it is only the strained legalistic argument of the appellant that gives any suggestion of ambiguity.

Neither are we impressed by the appellant's argument that the location of the alleged conferral of coverage within an exclusionary clause is immaterial. We agree entirely with the appellees that the cases cited by appellant to support this portion of the argument simply fail to do so. In *McEvoy v. Security Fire Insurance Co.,* 110 Md. 275, 73 A. 157 (1909), an exclusion in a fire insurance policy excluded coverage for loss by earthquake. The exclusion was itself limited in that coverage would be provided for fire caused by earthquake. This exception within an exclusion in no way extended coverage beyond that originally provided. In *Koser v. American Casualty Co.,* 162 Pa. Super. 63, 56 A. 2d 301 (1948) the policy provided coverage for accidental injuries incurred in the operation of an automobile. The policy excluded motorcycles and airplanes from the definition of automobile. The Court held that the exclusionary clause showed clearly that the term automobile was used in its generic sense as meaning any self-propelled vehicle and that a tractor was

intended to be covered. We do not think the exclusion in definition is in any way apposite to an exclusion from loss.

In addition, appellant directs our attention to the following language appearing on the face page of the policy, providing insurance not only for

> " 'those coverages indicated below by a premium charge' but in addition 'other perils *and . . . other coverages* . . . when endorsed hereon or *added hereto'.* (emphasis added)".

It then argues that the "explicit assumption of liability for 'accident . . . resulting from flood' " constitutes coverage added thereto. Once again appellant is trying to use an exclusion to extend coverage when the policy plainly on its face shows which perils were covered and which were not. We do not think language found only in an exclusionary clause can be reasonably construed as adding additional coverage pursuant to the provision just quoted.

In summary, we hold that the Lexington and Continental policies insured against damage resulting from certain named perils. Flood damage was absent from the list of those named perils and, indeed, was specifically excluded from coverage by the exclusionary clause of Section I of the policy. A limitation was placed on the operation of that exclusionary clause so that damage "by fire, sprinkler leakage, explosion, or accident . . . resulting from flood," would be covered. This clause did not operate to extend coverage to perils not otherwise within the purview of the policy. In light of the specific exclusion of flood damage the flood itself, although unexpected and unprecedented, cannot be considered an accident for which coverage was in any way provided. Nor can the damage resulting from such flood be considered as caused by an "accident . . . resulting from flood." This conclusion is inescapable because even though the damage was shown to be unprecedented there was no evidence to show that it was unexpected or surprising given the dimensions of the flood in question. That is, the damage was to be expected considering the magnitude of the flood.

II Hartford Steam Boiler Inspection and Insurance Company

The policy issued to Simkins by Hartford provided $2,000,000 of coverage (with a $25,000 deductible) for loss "from an Accident ... to an Object" and for "loss on the property of the Insured directly damaged by such Accident." The policy defined "Accident" as "a sudden and accidental breakdown of the Object" and defined "Object" as steam and hot water boilers and any piping on the premises or between parts of the premises which contained steam, condensate, or feedwater.

The pertinent provisions of Hartford's policy are as follows:

"In consideration of the Premium, the Company agrees with the Insured named in the Declarations made a part hereof respecting loss from an Accident, as defined herein, occurring during the Policy Period, to an Object, as defined herein, while the Object is in use or connected ready for use at the Location specified for it in the Schedule, subject to the Declarations, to the Exclusions, to the Conditions, to other terms of this policy and to the Schedules and Endorsements issued to form a part thereof, as follows:

SECTION I LOSS ON PROPERTY OF INSURED

To PAY for loss on the property of the Insured directly damaged by such Accident (or, if the Company so elects, to repair or replace such damaged property);

SECTION II EXPEDITING EXPENSES

To PAY for the reasonable extra cost of temporary repair and of expediting the repair of such damaged property of the Insured, including overtime and the extra cost of express or other rapid means of transportation;

SECTION III PROPERTY DAMAGE LIABILITY
****

SECTION IV BODILY INJURY LIABILITY
****

This policy does not apply:
****

(3) under Sections I and II to loss
****

   (d) from flood unless an Accident ensues and the Company shall then be liable only for loss from such ensuing Accident.
****

   (g) from any other indirect result of an Accident;
****

## SECTION A — BOILERS, FIRED VESSELS AND ELECTRIC STEAM GENERATORS — BROAD COVERAGE

As respects any Object designated and described in the Schedule, opposite the description of which, the word 'BROAD' is inserted in the column headed 'COVERAGE':

DEFINITION OF OBJECT.

'Object' shall mean any complete vessel designated and described in the Schedule and shall also include ... 4. any piping on the premises of the Insured, or between parts of said premises, with valves, fittings, traps and separators thereon, which contains steam or condensate thereof, generated in whole or in part in such vessel, and any feedwater piping between such vessel and its feed pump or injector; but Object shall not include (a) any part of such vessel which does not contain steam or water; (b) any piping which does not contain steam or condensate thereof; (c) any piping not on the premises of the Insured, used to supply any premises not owned by, leased by or operated under the control of the Insured; (d) any other piping, radiator, convector, coil, vessel or apparatus except as included in sections 1, 2, 3 and

4 above; (e) any reciprocating or rotating machine; nor (f) any electrical apparatus.

DEFINITION OF ACCIDENT.

'Accident' shall mean a sudden and accidental breakdown of the Object, or a part thereof, which manifests itself at the time of its occurrence by physical damage to the Object that necessitates repair or replacement of the Object or part thereof; but Accident shall not mean (a) depletion, deterioration, corrosion, or erosion of material; (b) wear and tear; (c) leakage at any valve, fitting, shaft seal, gland packing, joint or connection; (d) the breakdown of any vacuum tube, gas tube or brush; (e) the breakdown of any electronic computer or electronic data processing equipment; (f) the breakdown of any structure of foundation supporting the Object or any part thereof; nor (g) the functioning of any safety device or protective device.
\*\*\*\*

BOILER AND MACHINERY ENDORSEMENT H

[I]n consideration of the policy premium and subject to the Exclusions and Conditions of this Endorsement, with respect to Business on the said Premises,

> 1. To pay the Insured the amount of DAILY INDEMNITY specified therefor for each Day of Total Prevention of Business;
> 2. To pay the Insured a part of the DAILY INDEMNITY for each Day of Partial Prevention of Business; ...

\*\*\*\*

provided the Total Prevention of Business or the Partial Prevention of Business is caused solely by an Accident,
\*\*\*\*

EXCLUSIONS

The Company shall not be liable for payment for any Prevention of Business
\*\*\*\*

b. For any time during which Business would not or could not have been carried on if the Accident had not occurred; . . ."

Hartford concedes that the debris striking the bridge and breaking the steam pipes and condensate pipes crossing the river from the electrical plant to the manufacturing plant was an accident within the meaning of its policy. It contends, however, that Simkins never established in the evidence that the cost of replacing those pipes exceeded $25,000 (the amount of the deductible) and therefore it is not responsible for any damage to the appellant's property. The trial judge agreed and so found. We will discuss each item claimed separately.

## A. Proof of $110,361.97 in Damages to Objects

Roland Rutherford, the foreman of the crew from the J. W. Marchant Company that made all the repairs to the steam piping system, testified that he had reviewed five folders of Marchant invoices and had segregated the invoices relating to work he did on the steam pipes. The parties stipulated that all of the invoices were genuine and authentic and reflected fair and reasonable charges for what they purported to charge. Mr. Rutherford further testified that all of the material and labor listed on these invoices was used at the Simkins plant following the Agnes flood. He then identified a document summarizing the steam pipe repair costs as totaling $110,361.97.[4]

Mr. Rutherford stated the steam piping across the Patapsco River was missing after the flood. Ten or fifteen feet of steam piping inside Building #4 was also missing. The steam piping inside Building #15 had been torn out in part;

___

4. On cross-examination, Mr. Rutherford stated that the only nonsteam work performed by his crew was the laying of a 4-inch domestic water pipe across the Patapsco River. The length of the run across the Patapsco River was 90-100 feet. Mr. Rutherford calculated the extra cost to lay this pipe to be the labor cost of two men working for four hours each plus the materials cost for 100 feet of 4 inch pipe. All of the Marchant invoices, time-sheets, labor and materials records were introduced into evidence, thus enabling the jurors to compute for themselves the relatively small dollar amount attributable to this nonsteam piping work.

the remainder was bent, broken and cracked. Similarly, the steam piping in Buildings #5 and #6 had been "kicked" from its hangers and bent in all directions. Finally, the steam piping remaining in Building #4 had been twisted, bent, and cracked as a result of the tearing out of the bridge piping and the piping just inside Building #4, to which it had been attached.

The only substantial attack [5] that Hartford makes as to the sufficiency of Mr. Rutherford's testimony to raise a jury question as to damages, is based on the witness's statement that some of his work was repair of steam pipes inside of heaters and included small fittings. The record shows, however, that the heaters were steam heaters and steam pipes ran into and through them. There is no indication that Mr. Rutherford spent any time, or used any materials working on the heaters other than on their steam pipes. We are unable to follow Hartford's argument that the damages covered by the policy were limited to the replacement of the pipe which ran across the river. There was evidence from which the jury could have found that the accident also broke the pipes inside the buildings and indeed inside the heaters. The policy clearly covered all steam pipes in the plants and between the plants.

### B. Damages to Other Property of the Insured Totaling $77,885.06

In addition to providing coverage for damage to the plant's steam piping system, the Hartford policy also covered loss on the property of the insured directly damaged by the covered accident.

John Zacarias testified respecting the damage done to the power plant. Mr. Zacarias was the superintendent of the power plant and was in charge of the repair work in that plant following the storm Agnes. He stated that he carefully reviewed the applicable invoices and determined that $48,620.94 was spent to repair the power plant turbine. This

---

5. Hartford also argues that because Mr. Rutherford sometimes used expressions such as "or whatever" and "so forth" in describing the damage to the pipes his testimony was too general to furnish a basis for recovery. This argument is totally without merit.

turbine had been sealed watertight before Agnes. Following the storm, Mr. Zacarias discovered that the steam line running from the turbine across the river to the mill had been broken off, allowing sand and silt to pour through the broken pipe into the turbine. This broken steam pipe was, according to Zacarias, the only access the sand and silt had to the turbine. The $48,620.94 figure represented the cost of opening up the turbine, taking it apart, cleaning it, and reassembling it.

Mr. Zacarias further testified that the two smaller turbines in the paper mill were also sealed, and the only explanation for the presence of sand and silt inside them was that the pipe which fed steam to them had been broken off, permitting the foreign matter to gain entrance. The cost of repairing these two turbines was $7,565.28. We think this testimony is sufficient to present a jury question as to the amount of damage to the insured's other property by reason of the admitted accident.

Hartford argues there was no affirmative evidence to show that the sand could have gotten into the turbine only through the broken pipes. We disagree. It further argues, however, that the damage to the turbines was indirect and therefore not covered by its policy. We think its argument is without foundation on the basis of the very case it cites to support its argument. In *Hartford Steam Boiler Inspection and Insurance Co. v. Sonneborn & Co.,* 96 Md. 616, 54 A. 610 (1903) an insurance policy limited recovery to "immediate" damage to property caused by the explosion of certain steam boilers. The Court held that this meant that the damage must be direct or proximate, as distinguished from remote, and therefore water damage from a sprinkler system which was set off by a boiler explosion was held to be proximately caused by that explosion. It seems to us that in the instant case there was sufficient evidence from which the jury could find that the damage to the turbines was the direct result of the accident which broke the steam pipes and permitted mud or debris to enter therein.

William Gruber, an employee of McCormick Asbestos Company, testified as to the cost of replacing the insulation

around the pipes. A memorandum was introduced after his testimony in which he broke down the cost of insulating the steam pipes. Ignoring this, the appellee argues that there was no evidence that the damage to the steam pipe insulation was the result of the "alleged" breaking of the steam pipes. In addition, appellee argues that the policy does not cover the insulation specifically. We think it very clear that if the policy covered the pipes it would also cover the insulation which Mr. Rutherford testified was a necessary part of the pipes. Mr. Gruber's testimony, including the memorandum, was alone sufficient to raise a jury question as to the amount of the damages.

## C. Business Interruption Insurance

Appellant claims here, as it did below, that it is entitled to recover under Endorsement H of the policy for its business interruption losses over the entire period the plant was closed following the flood. It states as grounds for this position that "had the 'Accident' never occurred here, the business could have continued to operate normally, and therefore Exclusion b. of the Hartford policy [Endorsement H] is inapplicable." The Endorsement and Exclusion have been set out above. If, by the term "Accident" appellant is referring to the flood itself the argument is clearly without merit simply because the policy definition of that term cannot be so construed. If the term "Accident" refers to the destruction of the steam pipes the argument is equally unmeritorious because it is obvious from the evidence that flood damage entirely apart from the destruction of the steam pipes prevented business from being carried on for some time after the storm. The appellant's arguments on other points, however, require more attention.

Endorsement H provided for business interruption coverage in the fixed amount of $3,000 for each day of total prevention of business "caused solely by an Accident . . . to any Object" excluding the first ten days of the interruption.

It also provided for coverage in lesser amounts for each day of partial prevention of business.

Simkins introduced the testimony of Vincent ZuWallack, the factory's plant engineer, that if he had had steam power, he could have returned to producing paper by October 15, 1972 at the latest. All the motor repairs and other necessary repairs to the machines had been completed by the end of September and the last job, the regrinding of the calendar stacks, had been completed by early October.

The new bridge superstructure, which was not covered by Hartford's policy, and which would carry the replacement steam pipes across the Patapsco River had not, however, been erected by October 15, 1972. There was testimony from Roger Barnes, the supervisor of the Colborn Construction Company workmen, from which the jury could have concluded that the fixed price contracts for erecting the bridge were completed before Barnes left the Simkins site on November 25, 1972 to go to a different job in Bel Air.

After November 25, 1972, the only remaining work to be done to make the plant operable was the replacement of the steam piping system from the power plant across the river to the manufacturing plant. From November 25, 1972 until the factory was back to full production, the total (and later partial) prevention of business was "solely" due to the breakdown of the steam pipes across the river.

Albert Schneider, an adjuster specializing in business interruption losses testified that his study of the Simkins records indicated that the plant resumed operation on January 17, 1973 on a limited basis and resumed full operations on March 1, 1973. Based on a total prevention of business from November 25, 1972 until January 17, 1973, a 50% suspension of business from January 17 to January 31, 1973 and a 25% suspension of business from February 1 to February 28, 1973, the total business interruption damages which the jury could have found due and owing to Simkins were at least $193,500.

We think Mr. ZuWallack's testimony was sufficient to raise

a jury question as to the extent of the business interruption which was solely due to the accident of the breaking pipes.

> *Judgment in favor of Lexington Insurance Company and Continental Casualty Company affirmed.*
>
> *Judgment in favor of Hartford Steam Boiler and Inspection Company reversed.*
>
> *Case remanded for new trial in accordance with this opinion.*
>
> *Appellant to pay ²/₃ of the costs and Hartford Steam Boiler and Inspection Company to pay ¹/₃ of the costs.*