AMERICAN HOME ASSURANCE COMPANY *v.*
RONALD OSBOURN, Ind. & t/a O & B, Inc.
d/b/a Central Avenue Sunoco

\* \* \*

RONALD OSBOURN, Ind. & t/a O & B, Inc. d/b/a
Central Avenue Sunoco *v.* HAY BROTHERS
INSURANCE AGENCY, INC.

[No. 22, September Term, 1980.]

*Decided November 7, 1980.*

74

The cause was argued before MORTON, MOORE and WEANT, JJ.

*Alan R. Siciliano,* with whom were *O'Malley, Miles, Farrington & McCarthy* on the brief, for appellant American Home Assurance Company. *Edward P. Camus* for appellant Ronald Osbourn.

*Richard C. Burch,* with whom were *Weinberg & Green* on the brief, for appellee Hay Brothers Insurance Agency, Inc. *Edward P. Camus* on the brief for appellee Osbourn.

MOORE, J., delivered the opinion of the Court.

Two separate actions are before us in this consolidated appeal: in one, the insured sought a declaratory judgment and an award of expenses and settlement payments against his insurer which had disclaimed liability and declined to defend; in the other, filed the same day, the insured sued his insurance broker for breach of warranty and negligence because of alleged failure to procure complete insurance

coverage for his business. The insured prevailed in the first case and the insurer has appealed. In the second case, the court granted summary judgment for the broker on the ground that the insured's claim was barred by limitations, and the insured has appealed. We reverse the judgment in the first case and affirm the judgment in the second.

I

Each case had its origin in an incident on April 24, 1974 at the Capital Centre in Largo, Prince George's County, where Mr. Frank Sinatra was performing and the guests included then Vice-President Spiro Agnew and then Secretary of State Henry Kissinger. Nine private cars were improperly parked in a fire lane, described in testimony as an "escape route" for Messrs. Sinatra, Agnew and Kissinger. The Maryland Park Police ordered the vehicles towed away and impounded. This service was duly performed, pursuant to a contractual agreement, by appellant-appellee, Ronald Osbourn, the operator since 1969 of Central Avenue Sunoco, in nearby Seat Pleasant.[1]

Eight of the car owners ("Colby" et al.), later united in a declaration against Mr. Osbourn and his company [2] seeking compensatory and punitive damages aggregating $4,040,000 for alleged trespass and conversion. The ninth owner ("Varasano") filed a separate suit for $550,000 alleging negligence, malicious prosecution and false imprisonment.

At the time these cases were filed, Osbourn was insured under a "package" Service Station Policy by the appellant, American Home Assurance Company (hereinafter

---

[1]. Police regulations governed the towing of vehicles by private service station operators under specified criteria. Osbourn and other operators were assigned certain geographical areas from which they would tow vehicles to their own stations at the direction of the police.

[2]. Though not relevant to the issues before us, Osbourn impleaded Maryland-National Capital Park and Planning Commission for "any and all acts of conversion alleged to have occurred." The trial court granted the Commission's motion under Rule 323 (b) raising preliminary objection on grounds of governmental immunity and Osbourn appealed. The Court of Appeals affirmed. O & B, Inc. v. Maryland-Nat'l Capital Park, etc., 279 Md. 459, 369 A.2d 553 (1977).

"American Home"), effective January 6, 1972 to January 6, 1975. Osbourn purchased the policy through Hay Brothers Insurance Agency, Inc., insurance brokers. American Home provided representation for Osbourn in the Varasano case. The record is unclear as to the ultimate disposition of the Varasano case and it is not involved in this appeal.[3]

In the Colby case, the company first notified Osbourn by letter dated August 14, 1974 that it would present a defense on his behalf but that he might also engage counsel of his choice because the suit was in excess of policy limits and there was no coverage for punitive damages under the policy.[4] Shortly thereafter, by letter dated September 11, 1974, American Home retracted and advised Osbourn that there was no coverage because of an exclusion in the policy for "intentional acts."[5] Therefore, it disclaimed liability and declined to provide a defense. Osbourn then retained private counsel. The case was ultimately settled for $3,000 in December 1977.

On September 25, 1978, Osbourn instituted two suits in the Circuit Court for Prince George's County. One was a declaratory judgment action against American Home, with a demand for a jury trial, seeking a determination that American Home should have defended Osbourn in the Colby case and recovery of the settlement costs in that proceeding as well as reimbursement of attorneys' fees, costs, and expenses incurred in both the Colby suit and the declaratory judgment action. The other lawsuit was filed against Hay Brothers Insurance Agency, Inc. on grounds of negligence and breach of warranty for not procuring complete insurance coverage. The broker raised the issue of limitations by a special plea.

---

**3.** The lower court rejected any theory of estoppel or waiver in favor of Osbourn because of the Varasano matter and a 1972 case where American Home had provided a defense in a proceeding arising out of a towing operation. Osbourn concedes that the question of estoppel or waiver is not before us.

**4.** The $4,040,000 compensatory and punitive damages originally claimed in the Colby case were reduced in an amended declaration to $48,000.

**5.** Under the exclusion, the liability provisions of the policy did not extend "to bodily injury or property damage caused intentionally by or at the direction of the Insured...." As noted *infra,* we do not decide the insurer's appeal on the basis of this exclusion.

The cases were consolidated for trial. The court granted Hay Brothers' motion for summary judgment, holding that the action was not brought within three years of the time it accrued and was therefore barred by limitations.

In the declaratory judgment action, upon the conclusion of the evidence and denial of motions for a directed verdict, the following "special issue" was submitted to the jury over objection by American Home:

"If any property damage resulted in the Colby case, was it caused intentionally by or at the direction of Mr. Osbourn or his employees?"

The court instructed briefly and defined "intentional." After 19 minutes' deliberation, the jury returned with a negative response to the issue presented. The trial court then rendered an opinion finding that American Home was under a duty to defend Osbourn in the Colby case pursuant to the policy coverage. The question of damages was heard at a later date. At that time, the court awarded Osbourn a judgment of $22,250.10, plus interest, representing $10,419.05 in legal fees and costs in the Colby case as well as the $3,000 paid in settlement, and $8,831.05 in legal fees and costs in the declaratory judgment action.

## II

We shall address first the issues raised in the appeal of American Home. Its primary contention is that the court erred in declaring that American Home should have defended Osbourn in the Colby case and that a totally irrelevant issue was submitted to the jury. It also complains that the court improperly awarded Osbourn legal fees and costs in the prosecution of the declaratory judgment action.[6]

With respect to the principal assignment of error, our analysis begins with the policy itself, particularly the

6. Lesser contentions, which we need not consider, relate to alleged errors in jury instructions and in refusing to grant the insurer's motion for a directed verdict.

provisions of Section II, Part I pertaining to liability and the insurer's duty to defend:

> "*Coverage C—Liability* — The Company agrees to pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of bodily injury or property damage *caused by an occurrence and arising out of the service station operations hazard; and the Company shall have the right and the duty to defend any suit against the Insured seeking damage payable under the terms of this policy, even if any of the allegations of the suit are groundless, false or fraudulent;* but the Company may make such investigation and settlement of any claim or suit as it deems expedient." (Emphasis added.)

> "*Service Station Operations Hazard* — The ownership, maintenance or use of the premises for the purposes of a gasoline service station, and all operations necessary or incidental thereto, herein called 'service station operations,' including the automobile hazard defined as follows:

>> (a) The ownership, maintenance or use of any automobile for the purpose of service station operations, and the occasional use for other business purposes and the use for non-business purposes of any automobile owned by or in charge of the Named Insured and used principally in service station operations. . . ."

Under "definitions," the word "occurrence" as used in Section II, Part I means:

> "*An accident or continuous or repeated exposure to conditions* which results in bodily injury or property damage during the policy period, provided all damages arising out of such exposure to substantially the same general conditions existing at or emanating from each premises location of the

Named Insured shall be considered as arising out of one occurrence." (Emphasis added.)

Turning to the question of whether American Home was under a contractual obligation to defend Osbourn in the Colby suit, the applicable Maryland law was set forth by Judge Eldridge in *Brohawn v. Transamerica Insurance Co.,* 276 Md. 396, 347 A.2d 842 (1975):

> "The obligation of an insurer to defend its insured under a contract provision such as here involved is determined by the allegations in the tort actions. If the plaintiffs in the tort suits allege a claim covered by the policy, the insurer has a duty to defend. . . . Even if a tort plaintiff does not allege facts which clearly bring the claim within or without the policy coverage, the insurer still must defend if there is a *potentiality* that the claim could be covered by the policy." (Citations omitted.) (Emphasis in original.)

*Id.* at 407-08, 347 A.2d at 850. Of course, every fact necessary to establish coverage need not be alleged. As the Court of Appeals held in the case of *United States Fidelity and Guaranty Co. v. National Paving and Contracting Co.,* 228 Md. 40, 178 A.2d 872 (1962), the allegations actually made may be sufficient "to indicate a potentiality" that the injury in question was caused by some act or omission "*covered by the terms of the contract.*" (Emphasis added.) *Id.* at 54-55, 178 A.2d at 879.[7] Moreover, under the language of the liability provision previously quoted, even if the allegations of the suit are "groundless, false, or fraudulent," the insurer must defend any suit against the insured seeking damages payable under the terms of the policy *if* the injury *claimed* is covered.

---

**7.** In United States Fidelity and Guaranty Co. v. National Paving and Contracting Co.. potential coverage under the policy which provided coverage to National for operations performed by an independent contractor, was found by the Court on the basis of an allegation that the accident resulted from the negligence of the driver and that the driver was "the agent, servant and employee" of both Sudbrook (the independent contractor) and National Paving. *See generally* Annot., 50 A.L.R.2d 458 (1956).

> "This language [groundless, false, or fraudulent allegations] means that the insurer will defend the suit, if the injured party states a claim, which, qua claim, is for an injury 'covered' by the policy; it is the claim which determines the insurer's duty to defend;"

*Brohawn, supra* at 408, 347 A.2d at 850 *quoting* Chief Judge Learned Hand in *Lee v. Aetna Casualty & Surety Co.,* 178 F.2d 750, 751-52 (2nd Cir. 1949).

Here, the amended declaration of the eight aggrieved car owners contained, in Count I, a claim for intentional, wilful trespass. It was alleged that the removal of the automobiles from the Capital Centre parking lot was "without the consent or authority" of the plaintiffs; and that the defendants "deflated the tires ... and disabled the vehicle[s] on defendant's premises in a locked, enclosed area. ..." Count II alleged conversion in that the vehicles were "wrongfully and unlawfully detained." [8] As a result of the trespass and conversion, plaintiffs claimed to have suffered damages by "loss of use" of their family vehicles, "loss of and interruption in their normal activities, embarrassment, and money losses for the recovery of their vehicle[s]. ..." None of the counts in the thirty-two count declaration alleged negligence. More importantly, no count alleged facts which fall — even potentially — within the meaning of "occurrence" as defined in the policy.

Because the policy defines an occurrence as an "accident" or a "continuous or repeated exposure to conditions," those terms must be considered separately. "Accident" is defined in Webster's Third New International Dictionary (unabr. ed. 1966) as "1 a: an event or condition occurring by chance or arising from unknown or remote causes ... b: lack of intention or necessity." Black's Law Dictionary 31 (rev. ed. 1968) states that in the context of accident insurance contracts, "[a]n accident ... is an event happening without any human agency, or, if happening through such agency,

---

8. The remaining thirty counts alternated between trespass and conversion.

an event which, under circumstances, is unusual and not expected by the person to whom it happens." As for the second meaning of occurrence, *i.e.,* a "continuous or repeated exposure to conditions," the appellant presented the testimony of an expert in the field of underwriting, who cited as an example the discharge of fumes from a pipe over a period of time.

In the instant case it cannot seriously be asserted that the trespass and conversion even remotely alleged an accident. In this connection, we observe that the trial testimony made it abundantly clear that in the process of towing the vehicles from Largo to Seat Pleasant there was no improper driving, no mishaps occurred and there was no resulting damage to either persons or property.[9] Clearly, there was no "occurrence" insofar as the policy defined occurrence as "an accident." Furthermore, a one-time towing operation does not fall within the "continuous or repeated exposure to conditions" language of the definition of occurrence. Plainly, the second meaning of "occurrence" is not alleged. *See Steyer v. Westavo Corp.,* 450 F. Supp. 384 (D. Md. 1978).

It is settled law that insurance contracts must be interpreted like other contracts, according to the sense and meaning of the terms, *John Hancock Life Insurance Co. of Boston v. Plummer,* 181 Md. 140, 142, 28 A.2d 856, 857 (1942), and if an ambiguity exists it will be resolved against the draftsman of the policy. *United States Fidelity and Guaranty Co. v. National Paving and Contracting Co.,* 228 Md. 40, 50, 178 A.2d 872, 877 (1962). In the instant case there was no ambiguity. There was nothing resembling an "occurrence" alleged in the declaration which would trigger appellant's duty to defend under the liability provisions of the policy.

Osbourn's position, as we understand it, is that the liability section of the policy must be read in conjunction with the paragraph which immediately follows, entitled "Service Station Operations Hazard." We agree. However, the appellee seeks to apply the hazard provision in isolation,

---

9. At the service station, the air was released from one tire of each of the vehicles to prevent their being driven away. None of the cars was damaged.

independently of the immediately preceding provision (Coverage C-Liability) of the policy. Appellee overlooks the conjunctive "and" after the word "occurrence."[10] There must first be an "occurrence" as defined in the policy; and it must arise out of the service station operations hazard. We have already concluded that there was no "occurrence" under the facts and circumstances of this case.

Finally, it is apparent that improper reliance was placed below upon one of the exclusions in the insurance policy which provided that the insuring clause contained in Section II did not apply "to bodily injury or property damage caused intentionally by or at the direction of the insured." Osbourn here contends that "it was for the jury to determine whether the facts of this case as revealed by the evidence, fit within the exclusions of the policy. The jury declared that they did not." We disagree. It is plain that the court submitted to the jury an irrelevant issue. The exclusion was inapplicable for the reason that there was no language in Section II, Part I, the liability provision, which afforded coverage to the appellee in the first place under the facts alleged. "An exclusionary clause generally cannot be said to create coverage where none existed before." 13 Appleman, *Insurance Law and Practice* § 7387 (1976) at 179 (footnote omitted). In *Simkins Industries, Inc. v. Lexington Insurance Co.*, 42 Md. App. 396, 401 A.2d 181 (1979), Judge Thompson stated in language appropriate here:

> "[A]ppellant is trying to use an exclusion to extend coverage when the policy plainly on its face shows which perils were covered and which were not. We do not think language found only in an exclusionary clause can be reasonably construed as adding additional coverage. . . ."

*Id.* at 406, 401 A.2d at 187. *Accord, LeDoux v. Iowa National Mutual Insurance Co.,* 262 N.W.2d 418 (Minn. 1978); *State Farm Fire & Casualty Co. v. Volding,* 426 S.W.2d 907 (Tex. Ct. Civ. App. 1968).

---

10. Had the liability provision been written in the disjunctive, appellee's argument might have possessed some merit.

## III

American Home next contends that the trial court erred in awarding the appellee legal fees and costs in the pursuit of the declaratory judgment action.[11] We agree.

The general rule in Maryland pertaining to the award of attorneys' fees in a declaratory judgment action was most recently applied in *Bankers and Shippers Insurance Co. of New York v. Electro Enterprises*, 287 Md. 641, 415 A.2d 278 (1980). There, the test as articulated by the Court was couched in terms of an insurer's breach of its contractual duty to defend. The Court stated:

> "With respect to similar policy provisions, this Court has held that an insurer is liable for the damages, *including attorneys' fees*, incurred by an insured as a result of the insurer's breach of its contractual obligation to defend the insured against a claim potentially within the policy's coverage, and this is so whether the attorneys' fees are incurred in defending against the underlying damage claim or in a declaratory judgment action to determine coverage and a duty to defend. . . . *Therefore, whenever an insured must conduct his own defense at his own expense as a result of an insurer's breach of a contractual duty to defend its insured, the insured may recover the expenses of that defense from the insurer.*" (Citations omitted.) (Emphasis added.)

*Id.* at 648, 415 A.2d at 282. *Accord, Cohen v. American Home Assurance Co.*, 255 Md. 334, 258 A.2d 225 (1969); *Anderson v. The Maryland Casualty Co.*, 123 Md. 67, 90 A. 780 (1914).

Speaking for this Court in *Maryland Automobile Insurance Fund v. Sparks*, 42 Md. App. 382, 400 A.2d 26 (1979), Judge Lowe stated the rule in the following terms:

> "Ordinarily counsel fees are not awarded in a

---

11. The court also awarded Osbourn $10,419.05 in legal fees and costs in the Colby case. Because of this Court's ruling that American Home was under no duty to defend Osbourn in that suit, the awarding of those legal fees and costs is, of course, negated.

declaratory judgment action, . . . however, such fees
and costs may be recoverable where an insurer has
unjustifiably refused to defend its insured."
(Citations omitted.)

*Id.* at 395, 400 A.2d at 33. We think the rule in *Electro* and
*Sparks* is plain. If an insurer breaches its contractual duty
to defend a claim that falls within or potentially falls within
the policy's coverage, then the insurer is liable for attorneys'
fees incurred in the underlying defense of that claim as well
as in a declaratory judgment action which determines the
coverage and duty to defend.

The lower court awarded attorneys' fees after it concluded,
albeit erroneously, that American Home was in breach of its
contractual duty to defend Osbourn in the Colby case. How-
ever, in light of our above holding that American Home had
no obligation to defend Osbourn, it was justified in
abstaining from that litigation and the award of attorneys'
fees to Osbourn in the declaratory judgment action was
therefore erroneous.

## IV

On September 25, 1978, the same day that Osbourn filed
his declaratory judgment action, he also instituted suit in
the Circuit Court for Prince George's County against his
insurance broker, Hay Brothers, alleging breach of war-
ranty and negligence in failing to procure complete insur-
ance coverage for his service station. Hay Brothers filed a
motion for summary judgment based upon the statute of
limitations. The lower court granted the motion and
Osbourn appealed.[12] The issue of limitations is now before
us.[13]

The parties are in agreement that the applicable statute

---

**12.** The record is silent as to the trial court's reasoning in support of its
action in granting appellee's motion for summary judgment.

**13.** Other issues raised by the appellant involve improper pleading of
limitations and revival of an action already barred. We find no merit in
these contentions.

of limitations is found in Md. Cts. & Jud. Proc. Code Ann. § 5-101 which states:

> "A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time in which an action shall be commenced."

The issue presented for our consideration is when did the cause of action accrue. The general rule applicable in Maryland is that the statute of limitations begins to run from the date of the alleged wrong and not from the time the wrong is discovered. *See generally Harig v. Johns-Manville Products Corp.,* 284 Md. 70, 394 A.2d 299 (1978); *Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972); *Poffenberger v. Risser,* 46 Md. App. 600, 421 A.2d 90 (1980). However, in cases of professional malpractice, the Court of Appeals has adopted the "discovery rule" [14] which alleviates the harsh consequences resulting from the application of the general rule. *E.g., Watson v. Dorsey,* 265 Md. 509, 290 A.2d 530 (1972) (attorney malpractice); *Hahn v. Claybrook,* 130 Md. 179, 100 A. 83 (1917) (medical malpractice).

In recent years, the application of the discovery rule by the Court of Appeals has reached well beyond the traditional "learned" professions and now applies in diverse professional settings: *Mattingly v. Hopkins,* 254 Md. 88, 253 A.2d 904 (1969) (civil engineer); *Steelworkers Holding Co. v. Menefee,* 255 Md. 440, 258 A.2d 177 (1969) (architect and contractor); *Leonhart v. Atkinson,* 265 Md. 219, 289 A.2d 1 (1972) and *Feldman v. Granger,* 255 Md. 288, 257 A.2d 421 (1969) (accountant). *See Callahan v. Clemens,* 184 Md. 520, 41 A.2d 473 (1945) (wall construction).

The initial inquiry, therefore, is whether the insurance broker, Hay Brothers, falls within the ambit of the discovery rule. We believe it does.[15] Our decision is based upon the

---

**14.** Under the discovery rule, the statute begins to run from the time of the discovery of the alleged injury or when it should have been discovered by the exercise of due diligence.

**15.** Osbourn, as appellant, does not dispute the status of the broker as a "professional" but argues on other grounds that the action was not barred.

cases above cited which have extended the discovery rule
well beyond its initial application to medical doctors in *Hahn
v. Claybrook, supra;* and upon the underlying rationale of
the rule, that a tort in professional malpractice cases "may
go unnoticed for years, because the plaintiff is unqualified to
ascertain the initial wrong and could not reasonably be
expected to know of the tort until actual injury is
experienced." *Harig v. Johns-Manville Products Corp.,* 284
Md. 70, 76-77, 394 A.2d 299, 303 (1978). The insurance
broker, in our judgment, was engaged in a professional
endeavor.

The critical question, then, is the date when Osbourn
knew or should have known that his insurance broker sold
him an insurance policy which was inadequate because it
afforded incomplete coverage. Under the discovery rule, the
plaintiff would have three years from that time in which to
file suit. Here, the appellant would have us rule that no
damages were incurred in the defense of the Colby suit until
the case was settled in December 1977 and, therefore, his
cause of action did not "accrue" *at least* until that time.
Osbourn also argues that the pendency of the declaratory
judgment action against American Home postponed the
running of the statute because he could not know whether
his policy provided coverage in the Colby suit until the
declaratory judgment case was decided. The appellee, on the
other hand, argues that the cause of action accrued on
September 11, 1974, the date of American Home's letter to
Osbourn stating there was no coverage and declining to pro-
vide a defense.

Contrary to appellant's contention, a showing of the
precise amount of damages at the time of discovery of the
wrong is not required although, of course, there must be
some evidence of legal harm. In *Feldman v. Granger,* 255
Md. 288, 257 A.2d 421 (1969), Judge Finan stated for the
Court of Appeals:

"[A]s in the *Mattingly* case, and as in other tort
cases, the exact amount of damages sustained may
not be known at the time of the discovery of the

wrong. However, in our opinion this is not a sufficiently sound reason to postpone the accrual of the action or toll the running of limitations when other reasons grounded in public policy are considered."

*Id.* at 296, 257 A.2d at 426-27. *See Mattingly v. Hopkins, supra.* In our view, the statute of limitations in this case began to run on September 11, 1974 — the day Osbourn discovered that American Home would not defend. Osbourn knew then that he had to engage his own counsel in the Colby suit. We recognize that incurring the expense of counsel fees does not ordinarily constitute sufficient legal harm, in and of itself, to satisfy the "damage" requirement of the discovery rule. In the instant case, however, the cost of defending the Colby suit was a direct result of Hay Brothers' alleged malpractice in failing to procure adequate insurance coverage, one benefit of which would have been complete legal representation of Osbourn.

The effect of the declaratory judgment action on the application of the discovery rule need not detain us. Suffice to say, appellant could have filed his action against Hay Brothers within the requisite three year time period and the action could have been stayed pending the outcome of the declaratory judgment suit. *See Feldman v. Granger, supra,* 255 Md. at 294-95, 257 A.2d at 424-25.

> *Judgment against American Home Assurance Company reversed; judgment against Ronald Osbourn Ind., t/a O & B, Inc., d/b/a Central Avenue Sunoco affirmed; costs to be paid by Osbourn, et al.*