502 A.2d 1076

**Lewis Weber WILCOM**

v.

**William E. WILCOM et al.**

**No. 456, Sept. Term, 1985.**

Court of Special Appeals of Maryland.

Jan. 13, 1986.

Certiorari Denied March 24, 1986.

Charles H. Slingluff, Frederick, for appellant.

Gerald F. Gay (John Wheeler Glenn, and O'Connor, Preston, Glenn & Smith, P.A. on brief), Baltimore and Edwin F. Nikirk, II (Nikirk, Nikirk & Nikirk on brief), Frederick, for appellee.

Argued before MOYLAN and BLOOM, JJ., and JAMES C. MORTON, Jr., Associate Judge of the Court of Special Appeals (retired), Specially Assigned.

BLOOM, Judge.

In this specific performance action, the Circuit Court for Frederick County determined that appellant, Lewis Weber Wilcom (Lewis), had entered into a valid, binding contract to sell all of his shares of stock in 75–80 Dragway, Inc., a

family owned corporation, to the other stockholders, Lewis's brothers, William E. Wilcom, Michael J. Wilcom, J. Jerome Wilcom, and Anthony Wilcom (William, Michael, Jerome, and Anthony). Lewis was ordered to transfer his 799 shares to the purchasers upon receipt of $18,233.18, the purchase price calculated on the basis of a formula previously agreed upon among the parties, and he appealed. William, Michael, Jerome and Anthony were ordered to pay certain dividends to Lewis, and they cross-appealed.

We believe the trial court was entirely correct in decreeing specific performance but erred in ordering that dividends be paid to Lewis Weber Wilcom. Accordingly, we shall affirm in part and reverse in part.

## Background

Charles and Catherine Wilcom, the parents of Lewis, William, Michael, Jerome and Anthony, formed 75–80 Dragway, Inc., in 1960 to operate a drag race strip in Frederick County, Maryland. They gradually gave all of their stock in the corporation to their five sons but remained active in the corporation as officers. In 1969, Charles and Catherine Wilcom and their sons entered into an agreement to restrict the sale or transfer of stock in 75–80 Dragway, Inc., in order to insure that the corporation would remain a family business.

Basically, the agreement provided that a stockholder who desired to dispose of his shares could not sell or transfer them to anyone outside the family unless he first offered them to the officers and other stockholders at a price to be calculated according to a formula based on book value and net profits. In the event of the death of a stockholder, the surviving stockholders and officers would be privileged to purchase the decedent's shares from his estate at a price calculated according to the same formula. The agreement also provided that "[s]uitable amendments to the articles of incorporation shall be adopted and kept in force by the corporation to make this agreement effective." Other spe-

cific provisions of the agreement will be referred to in the discussion of the issues raised by the parties.

On November 3, 1982, Charles H. Slingluff, as attorney for Lewis Wilcom, sent to each of his client's parents and brothers (who, with Lewis, comprised all of the officers and stockholders of 75–80 Dragway, Inc.) copies of a letter addressed to all of them, as follows:

In re: Sale of Weber Wilcom Stock

Gentlemen, good morning:

Pursuant to instructions from my client, I hereby offer to sell unto you his outstanding shares of stock in the corporation known as 75–80 Dragway.

I am,

Very truly yours,
Charles H. Slingluff

On November 18, well within the thirty day period provided in the agreement for stockholders and officers to accept a stockholder's offer to sell his stock, William, Michael, Jerome and Anthony responded to Lewis's offer as follows:

To: Weber Louis Wilcom [sic]

The undersigned Common Stockholders of the 75–80 Dragway, Inc., a corporation organized under the laws of the State of Maryland, do hereby accept the offer to sell your outstanding shares of stock in the Corporation known as 75–80 Dragway, Inc.

The Common Stockholders, William E. Wilcom, Michael J. Wilcom, Jefferson J. Wilcom, and Anthony L. Wilcom are prepared to comply and settle for the purchase of the outstanding shares of Stock in accordance with the "Agreement Restricting Transfer of Stock" dated October 1, 1969, executed by all of the then Shareholders within the time provided in the Agreement upon delivery of all of the Certificates of Stock issued to L. Weber Wilcom, properly endorsed.

Counsel, Charles H. Slingluff, Esquire, representing you should contact the firm of Offutt & Horman, P.A., Attorneys for the hereinafter named Shareholders to

arrange a date, time and place for the transfer and settlement on the shares of Stock.

Dated this 18th day of November, 1982.

William E. Wilcom
Michael J. Wilcom
Jefferson J. Wilcom
Anthony L. Wilcom

Mr. Slingluff, by letter dated December 3, 1982, advised the purchasers' attorney, W. Jerome Offutt, that the minimum acceptable purchase price for Lewis's stock in 75–80 Dragway, Inc., was $150,000. Nevertheless, on December 16, 1982, Mr. Offutt wrote to Mr. Slingluff that the firm of Stoy, Malone & Company, accountants, using the formula set forth in the 1969 agreement, had valued Lewis's stock at $18,233.18, which the purchasers were prepared to tender upon receipt of the three certificates evidencing the 799 shares registered to Lewis. A copy of the accountant's computations was enclosed. Mr. Slingluff was requested to advise Mr. Offutt when delivery of the certificates could be made and the sale concluded in accordance with the 1969 agreement. Mr. Slingluff's response, on January 6, 1982, was that the amount tendered was far short of his client's $150,000 expectation and that his client's offer was withdrawn.

Lewis's brothers, joined by their parents, brought this specific performance action in May 1983. Lewis counterclaimed against his brothers, asserting (first count) that they had negligently failed to perform their corporate duties and (second count) that they had conspired among themselves to deprive Lewis of information about the workings of the corporation and refused to have annual stockholders' meetings.

### Contentions

Appellant presents several arguments. He contends that

1. the agreement is a contingent option that did not become effective because not all of the terms were complied with,
2. there was no offer and acceptance of a specified number of shares at an agreed price,
3. no money was ever tendered by the stockholders-purchasers and there was no evidence that they were ready, willing and able to perform,
4. that the appellees, as officers and directors of the corporation, breached their fiduciary duties to keep appellant informed so that he would know the value of his stock,
5. the purported acceptance did not comply with the agreement because the valuation was based on a fiscal year different from that provided in the by-laws, and
6. the evidence showed that the corporation, not the stockholders, was buying the stock.

The cross-appellants raise only one issue: did the court err in awarding stock dividends to Lewis for years in which cross-appellants were entitled to ownership of Lewis's stock?

## I

Appellant points to the provision in the 1969 agreement that suitable amendments would be made to the articles of incorporation to make the agreement effective. He argues that since the articles of incorporation were never amended with respect to the restrictions on transfers of stock, the agreement never became effective. There is no merit in that argument. There was no statutory requirement to amend the articles of incorporation, so amendment was not necessary to make the agreement effective. It is permissible, not mandatory, to include in articles of incorporation restrictions on transferability of stock. Md. Corps. & Ass'ns Code Ann., § 2–104(b)(2) (1985). In any event, amendment of the corporate charter to provide notice to

prospective purchasers that transferability of stock is restricted would hardly be necessary as between the parties who executed the agreement to restrict transferability.

■ Appellant also contends that in order for the 1969 stockholders' agreement to be effective all shares of stock had to be bound by it and that there were 1000 shares of unissued stock (erroneously referred to by appellant as Treasury stock) that were not expressly made subject to the agreement. This contention, too, is utterly devoid of merit.

The agreement provides that every share of common stock theretofore issued or which may be thereafter issued "shall be held, owned and transferred subject to all the terms, conditions and options herein contained."

The corporation was authorized to issue 5000 shares; it had issued 4000 shares, all of which were then outstanding. On each certificate for all outstanding shares there had been typed: "Subject to the provisions of Stock Purchase Agreement dated October 1, 1969."

Presumably, if any additional shares are ever issued, the certificate will bear a similar legend. Until additional shares are issued, nothing further need be or reasonably can be done to insure that every share heretofore issued or which hereafter may be issued will be made subject to the terms of the agreement. The agreement does not refer to authorized but unissued stock.

## II

Appellant next contends that his attorney's "offer" letter of November 3, 1982, was not an offer but merely a solicitation for an offer. He points to the fact that the letter does not indicate either the number of shares proposed to be sold or the price, two essential elements of any offer to sell stock. He further argues that there is not a sufficient writing to be enforceable under the applicable Statute of Frauds, Md.Com.Law Code Ann., § 8–319 (1975), which provides:

A contract for the sale of securities is not enforceable by way of action or defense unless

(a) There is some writing signed by the party against whom enforcement is sought or by his authorized agent or broker sufficient to indicate that a contract has been made for sale of a stated quantity of described securities at a defined or stated price....

■ Mr. Slingluff's letter was unequivocably stated to be an offer, not an invitation or solicitation to negotiate. The fact that it was addressed to his client's parents and brothers, the officers and shareholders of the corporation, is a clear indication that the offer was made with reference to the 1969 agreement, which required a stockholder to offer his shares to officers as well as fellow shareholders if he desired to sell. There is no other logical explanation for including the parents who, having given away all their stock, would hardly be considered likely purchasers except for that agreement.

Since Mr. Slingluff's letter offered for sale "his [Lewis's] outstanding shares of stock" in the corporation, the number of shares being offered was ascertainable by reference to the corporate ledgers. The manner of determining the price had previously been settled in the 1969 agreement of the stockholders. Accordingly, since any terms missing from the offer itself were clearly ascertainable by reference to other documents, the offer was not too uncertain or indefinite to be accepted.

■ As for the Statute of Frauds argument, the offer itself, signed by an authorized agent,[1] together with the 1969 agreement, signed by appellant himself, sufficiently identifies the securities offered for sale, establishes the quantity offered for sale, and defines (by fixed formula) the price per share. That in itself would be sufficient to satisfy the statute. Furthermore, on December 16, 1982, counsel

---

1. Appellant has not contended that Mr. Slingluff was not authorized to write the "offer" letter of November 3, 1982.

for appellees sent a confirming letter setting forth the number of shares and the calculated price for them. Appellant did not respond to that letter until January 6, 1983. Subsection (c) of § 8–319 of the Commercial Code provides that the written contract for the sale of securities required by subsection (a) may arise if the party seeking to enforce the contract had, within a reasonable time, sent the other party a written confirmation containing sufficient details to satisfy the statute and no written objection is made within ten days. The December 16 letter, therefore, constitutes a writing within the meaning of § 8–319(a).

## III

■ Appellant argues that no money was ever tendered by appellees, but the short answer to that argument is that no actual tender was required. The 1969 agreement among the stockholders provided that the purchase price for stock sold pursuant to that agreement was to be paid upon delivery of the stock certificates. Appellees announced that they stood ready to pay the money and requested appellant to name the date. Appellant not only refused to perform the contract, he denied that a contract existed. Because of appellant's failure or refusal to perform, appellees' duty to perform or tender performance was suspended. *See* Restatement (Second) of Contracts § 237 (1981).

■ Appellant also contends that specific performance should not have been decreed because there was no evidence that the purchasers were ready, willing and able to perform. The bringing of an action for specific performance of contract promptly after it has been breached by the defendant, asserting that the plaintiff stands ready, willing and able to do that which in equity and conscience may be required of him, amounts to a clear and complete offer of performance and a submission to the orders and jurisdiction of the court, which is all that should be required. *See* 71 Am.Jur.2d *Specific Performance* § 201 (1973). Moreover, in this case the evidence disclosed that appellees intended to

purchase appellant's stock for resale to the corporation so that it could retire the stock. Their counsel had received a check from the corporation in the full amount of the purchase price, so that appellees could be reimbursed immediately for money paid by them to acquire the stock from appellant.

The court did not err in concluding that appellees had established their readiness, willingness and ability to perform their part of the bargain.

## IV

■ Appellant's contention that appellees, as officers and directors of the corporation, breached their fiduciary duties to keep him informed so that he would know the value of his stock is simply belied by the evidence. Although 75–80 Dragway, Inc., like many closely held family corporations, operated with a great deal of informality and did not regularly conduct meetings, it did keep records of its receipts and disbursements, and it did issue annual statements. There is nothing in the record to indicate that the same information from which the corporation's accountants computed the sales price of appellant's stock was not available to appellant. Had appellant chosen to do so, he could have computed what his stock was worth under the 1969 agreement formula before he offered it for sale.

## V

■ Appellant's assertion that appellees' purported acceptance of his offer did not comply with the stockholders' agreement is likewise belied by the record. The corporation's accountants computed the purchase price of appellant's stock on the basis of an October 1 through September 30 fiscal year. The by-laws of the corporation provided that the fiscal year "shall be the calendar year unless otherwise provided by the Board of Directors." Appellant refers to testimony by one of the appellees, an officer and director of the corporation, to the effect that he did not know of any

amendments to the by-laws. From these bits and pieces appellant jumps to the conclusion that the "acceptance" fixing the purchase price at $18,233.18 was improperly based on the wrong fiscal year so there was no real acceptance, merely a counteroffer.

Appellant is mistaken. The fact that the corporation's accountants for several years had kept the books on a fiscal year other than a calendar year, as reflected by annual statements, clearly established that the Board of Directors at least tacitly had approved of the change. No amendment to the by-laws was required, merely a decision by the directors. Furthermore, even if the purchase price had been computed inaccurately, that computation was not part of the acceptance but was subject to correction upon bringing the error to the court's attention. Finally, there was uncontradicted evidence that there would have been no substantial difference in figures if the purchase price had been computed on a calendar year basis.

## VI

We have previously alluded to evidence to the effect that appellees intended to resell the stock to the corporation as soon as they acquired it from appellant. Appellant argues that although the stockholders' agreement required him to offer his shares to other stockholders and officers, which he did, it was the corporation, rather than the stockholders, that was buying his stock. It is unclear whether appellant is contending that there was no acceptance from the offerees or that there was no tender by the offerees. Either contention would be meritless. The offer was made to appellees, and they jointly accepted it. What they intended to do with the stock after acquiring it from appellant was simply none of appellant's business. And, as we have discussed in Section III, *supra*, appellant's default made it unnecessary for appellees to tender any money.

## VII

Despite its determination that there was a binding, enforceable contract for the sale of Lewis's shares in 75–80

Dragway, Inc., to his brothers for the sum of $18,233.18, the court ordered William, Michael, Jerome and Anthony to pay dividends to Lewis for 1981, 1982, 1983, and 1984 because the stocks remained registered in Lewis's name on the books of the corporation during those years. Based on the total amount of dividends paid in each of those years, with a constant figure of 4,000 shares outstanding, the court ordered that dividends be paid as follows:

1981—$2.00 per share
1982—$5.00 per share
1983—$2.26 per share
1984—$2.0075 per share

The court was clearly wrong in ordering payment to Lewis of dividends for 1981. Not only was there no evidence to indicate that Lewis had not received his dividends for that year, Lewis never claimed that he was deprived of those dividends.

Lewis did complain that he had not received dividends in or for 1982, 1983, and 1984. The cross-appellants admitted that dividends had been declared and paid for those years, but they had decided that Lewis, having contracted to sell his stock to them, was not entitled to any share of those dividends. The court's award of dividends to Lewis, however, was based upon the fact that Lewis was still a stockholder of record on the books of the corporation throughout 1982, 1983, and 1984.

Maryland Corporations and Associations Code Annotated § 2–309 (1985 Replacement Volume) regulates the payment of dividends but is silent with respect to who is entitled to receive them.

It is a well-established rule that "[a]s between successive owners of a share, the dividend belongs to him who is the owner at the time it is declared; and this is true although there is a future day of payment." *Northern Central Dividend Cases,* 126 Md. 16, 29, 94 A. 338 (1915). Although the corporation would certainly be protected if it paid out dividends to the person who is registered as owner on the

corporate books on the date a dividend is declared (or on the date set by the directors for the closing of stock transfer books pursuant to Md. Corps. & Ass'ns Code Ann., § 2–511), "[a]s between vendor and vendee, or pledgor and pledgee, of stock, a transfer on the books of the company is not essential to perfect an equitable title in the vendee or pledgee." *Gemmell v. Davis,* 75 Md. 546, 552, 23 A. 1032 (1892). Or, as the Court of Appeals of New York expressed it:

> A purchaser of stock acquires by a contract of present sale a right to the benefits which may accrue on the stock bought, and that right is, for convenience, called the "beneficial ownership" of the stock.

*Deering Milliken v. Clark Estates, Inc.,* 43 N.Y.2d 545, 549, 402 N.Y.S.2d 987, 373 N.E.2d 1212 (1978), cited in Fletcher, *Cyclopedia Corporations,* § 5378 (Rev.1985).

The cross-appellants, therefore, were the equitable owners of Lewis's shares as of November 18, 1982, the date of their unequivocal acceptance of his offer to sell those shares. Lewis was not entitled to any dividends thereafter declared, which, of necessity, included dividends declared in 1983 and 1984, and the trial court erred in awarding him dividends for those years.

The 1982 dividend of $5.00 per share presents a more difficult problem. Neither side submitted any evidence as to when the 1982 dividend was declared, although the financial records indicate it was paid in 1982. From the fact that the cross-appellants refused to pay to Lewis any portion of the $20,000 distributed as dividends in 1982 because he had contracted to sell them his stock, the only reasonable inference is that the 1982 dividend was *paid* between November 18 and December 31, 1982.[2] But was it *declared* prior to November 18? If so, dividends on 799 shares belonged to Lewis as the legal and equitable owner of those

---

**2.** The by-laws merely provided that dividends were payable on such dates as the Directors may designate.

shares; if not, they belonged to the cross-appellants as equitable owners of the stock.

The only evidence in the record pertaining to when in 1982 the Directors declared a dividend is a brief response by appellee/cross-appellant Michael Wilcom to a question by Mr. Slingluff, who had called Michael as his witness.

Q. Now, sir, prior to the declaration made by the Board of Directors in 1982, did you meet with your four brothers, or three brothers, and decide not to pay Lewis Weber Wilcom the dividend due on his stock?

A. Yes, we did.

That evidence, elicited by the cross-appellee and nowhere contradicted, tends to establish that the Directors did not declare a dividend in 1982 until after Lewis contracted to sell his shares to his brothers and was therefore no longer deemed entitled to dividends. Even if we regard this fragment of testimony as inconclusive, in the absence of any evidence to the contrary there is simply nothing to support a conclusion or inference that the 1982 dividend was declared prior to November 18 of that year. The cross-appellee is not entitled to dividends for any of the four years referred to in the judgment.

*Summary*

In summary, we affirm the judgment of the lower court insofar as it declares that there was a valid, binding contract between the parties and orders that the parties specifically perform that contract; we reverse the judgment with respect to the award of dividends to the cross-appellee, Lewis Weber Wilcom.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.

COSTS TO BE PAID BY APPELLANT/CROSS-APPELLEE, LEWIS WEBER WILCOM.