JOHNSON & TOWERS BALTIMORE,
INC., Plaintiff/Counter
Defendant,

v.

VESSEL "HUNTER" in rem, and Clayton
O. Katski, t/a Clayton O. Katski Yacht-
ing Services, in personam, Defen-
dants/Counter Plaintiffs,

and

New Hampshire Insurance Group,
Third Party Defendant.

Civ. No. N–91–77.

United States District Court,
D. Maryland.

June 19, 1992.

Vicki A. Margolis and Venable, Baetjer and Howard, Baltimore, Md., for plaintiff/counter defendant.

C. Edward Hartman, III, Annapolis, Md., for defendants/counter plaintiffs.

James E. Gilbert and Snider, Buck & Migdal, Chartered, Annapolis, Md., for third party defendant.

## MEMORANDUM OPINION

NORTHROP, Senior District Judge.

I. *Introduction*

Plaintiff, Johnson & Towers, brought suit in admiralty to collect payment for work performed by Plaintiff in June and July of 1990 on Defendant Clayton O. Katski's, yacht, the vessel "Hunter." The

Hunter is a 1970, 53–foot, Hatheros Sport Fisherman.

In June of 1990, Defendant contacted Johnson & Towers and requested that they investigate and repair the cause of some smoking in the starboard engine on the Hunter. After an investigation of the problem, it was determined that pieces of engine insulation which raps around the exhaust riser were being ingested into the engines causing the smoke and damage to the engines. Both engines needed extensive repairs. There is no dispute that the ingestion of the engine insulation caused the engine problems.

Mr. Katski was advised of the problem and authorized the repairs. He authorized Johnson & Towers to perform all necessary repair work on both port and starboard engines. Between June 4, 1990 and July 5, 1990, Plaintiff repaired the Hunter as requested and authorized by Mr. Katski. On July 25, 1990, Johnson & Towers submitted an invoice in the amount of $27,469.25 to Mr. Katski for the repairs performed on the Hunter. Plaintiffs have not yet received any payment for their work. Plaintiffs seek the recovery for the invoice amount, and service charges under the invoice and credit-finance contracts for Defendant's failure to pay for the work he authorized. The service charges include interest, costs of collection, and certain attorney's fees.

Defendant admits that he authorized the repairs and that he has a valid contract with Johnson & Towers. Shortly after Mr. Katski authorized the repairs to the engines, Defendant submitted the claim to his insurer, New Hampshire Insurance Group, ("NHIG"). NHIG sent a marine surveyor, Mr. C. Robert Skord, to determine the cause, nature and extent of damage to Katski's yacht. Mr. Skord claimed that the engine damage from the exhaust insulation was due to a type of damage that is not covered under Mr. Katski's yacht insurance policy. Under the policy's terms, damage due to gradual deterioration or normal wear and tear was not covered, and NHIG claimed the engine damage was due to a gradual deterioration of insulation around the engine's exhaust.

Mr. Katski disagrees. Mr. Katski claims that the damage to the exhaust resulted from physical trauma. Mr. Katski maintains that such damage is covered by the insurance policy and, therefore, NHIG is liable.

Defendant brings a third-party claim against his insurance company alleging that the insurance policy he has covers these repairs. In addition, Third Party Plaintiff, Mr. Katski, maintains that NHIG is responsible for all costs as a result of dispute between Mr. Katski and Johnson & Towers. These costs include Mr. Katski's 1) legal expenses associated with bringing the third party claim, 2) Mr. Katski's legal expenses in defending against Plaintiff's claim and counterclaim, 3) the repair invoice amount, and 4) Plaintiff's claim for interest, costs and legal fees.

A four-day non-jury trial was conducted by this Court on March 19, 20, 24 and 25. At the close of trial, this Court made the following findings of fact. First, that Johnson & Towers did not cause the damage to the vessel Hunter. Mr. Katski failed to prove by a preponderance of the evidence that Plaintiff's work on the vessel was negligent or was the cause of the engine damage. Second, Mr. Katski had a valid contract with Plaintiff. Mr. Katski's credit-finance agreement, signed invoice, and his oral authorization of the repairs formed the basis of his obligation to the Plaintiff. Mr. Katski was, therefore, liable to Plaintiff.

In view of these findings and in accordance with the evidence presented at trial, the Court asked the parties to present findings of fact and conclusions of law on the remaining issues between Plaintiff and Defendant and Third Party Plaintiff and Third Party Defendant.

## II. *Findings of Fact & Conclusions of Law*

The cause of the damage to the engines is not in dispute. All of the professionals who examined the insulation and lagging concluded that the lagging came

loose and the fibrous material that composes the insulation was ingested into the engines. Nor is there any dispute that Mr. Katski authorized the work to be performed by Plaintiff. Mr. Katski testified that he had used Johnson and Towers' repair services before and had been satisfied with their work.

Defendant's relationship with Plaintiff goes back several years. Mr. Katski submitted and Plaintiff approved a credit-finance agreement for $15,000 in December of 1987. *See* Plaintiff's Exhibits 1 and 2. The credit application contains similar terms as the invoice Mr. Katski signed authorizing the repairs that are the subject matter of this suit. The credit-finance application states that a failure to pay will result in the accrual of certain service costs. *See infra* footnote 1.

Mr. Katski states that he did not pay Plaintiff for the June/July 1990 repairs, because he claims that Johnson and Towers' employees negligently caused the damage. Plaintiff's alleged negligence served as the basis for Defendant's counterclaim. Defendant asserts that Johnson and Towers' employees stepped and sat on the exhaust insulation, while repairing the engines. Mr. Katski states that on one occasion, he saw Mr. Kahl, a Johnson & Towers' employee, step on the exhaust riser. Further, Mr. Katski testified that since Johnson & Towers' employees had done much of the yacht's repairs over the past several years, it was likely that Johnson & Towers was responsible for the physical trauma which caused the engine damage. In addition to the alleged negligence which necessitated the June/July 1990 repairs, Mr. Katski claims that Plaintiff is responsible for the additional repair work done subsequent to the summer of 1990. Defendant maintains that Plaintiff's negligence in doing the 1990 repairs caused additional engine damage.

This Court disagrees. Ruling from the bench, this Court found that Defendant failed to establish by a preponderance of the evidence, that Plaintiff's employees caused any damage to the exhaust system or negligently made the 1990 repairs.

Defendant testified that numerous other companies had done repair work on the engines. Further, Defendant's own experts testified that the time between the physical trauma to the insulation and the engine damage would have been six months. Therefore, the 1987–88 repairs done by Johnson & Towers could not have caused the June/July 1990 engine damage.

Further, this Court found that Defendant failed to establish by a preponderance of the evidence that Johnson & Towers negligently performed the June/July 1990 repairs. Many of the subsequent repairs that were needed appear to be routine maintenance. In addition, most of the subsequent repairs were completely unrelated to the work that Johnson & Towers had done on the engines. Only when Defendant failed to make *any* payment after he was presented with the July invoice, did Plaintiff's employees stop going out to Mr. Katski's yacht to continue their efforts to satisfy Defendant's continued demand. However, once Mr. Katski was in breach of his promise to make timely payment, Plaintiff was relieved of any further obligation to perform. *See Wilcom v. Wilcom*, 66 Md.App. 84, 94, 502 A.2d 1076 (1986) (adopting Restatement 2nd of Contract § 237, that party's refusal or failure to perform suspended the other party's duty to perform).

Mr. Katski entered into a valid contract with Plaintiff. *See* Plaintiff Exhibits 1, 2 & 3. Plaintiff upheld its part of the bargain, or in any case, was relieved of any minor residual duty to Defendant. *Id.* This Court finds Defendant liable for the damages as specified under the Contract.

■ Defendant objects to payment of the "service collection" costs charged by Plaintiff. These costs were only included in the bill if the Defendant was late in paying, as in this case, and the Plaintiff needed to use an attorney in order to collect the invoice amount. Although Defendant admits authorizing work done by Plaintiff, Mr. Katski claims that finance or interest charges, and costs including attor-

ney's fees,[1] were not part of the agreed upon contract between the parties. Defendant asserts that these terms were added subsequent to Plaintiff's performance, and therefore cannot be part of the contract. The Court disagrees.

At trial, Mr. Katski testified that he had many dealings with Plaintiff. In fact, Mr. Katski agreed to their additional service costs prior to his authorization of the June/July, 1990 repairs. On December 11, 1987, Defendant testified that he submitted a credit application to Plaintiff for an extension of credit for performance of necessary repairs and maintenance work on the Hunter. *See* Plaintiff's Exhibit 1. Mr. Katski agreed in his credit application to pay all bills submitted to him by Plaintiff for work performed within 30 days of the date of any invoice issued. The credit application included the service costs if Mr. Katski failed to make timely payments. *Id.*

Although the repair authorization containing the service cost terms may have been signed after the repair work was performed, the service cost terms were part of the contract. *See Rocks v. Brosius*, 241 Md. 612, 217 A.2d 531 (1966) (where several writings are made part of the single transaction, they will be read together as evidencing an intention of the parties in regard to a single transaction even if executed at different times and the different writings do not refer to one another). Plaintiff had performed work for Defendant in the past. These service cost terms were always part of the invoice. Substantial work was performed on the basis of Mr. Katski's oral authorization *and* because Defendant has a credit line opened agreeing in writing to pay for work performed and pay service costs should he fail to make timely payment.

Further, the subsequent signing of the invoice by Defendant clearly satisfied these terms. As a rule, where negotiations are consummated by a written agreement, the intention of the parties must be ascertained from the written agreement. *Rafferty v. Butler*, 133 Md. 430, 105 A. 530 (1919). The terms were, therefore, part of this contract, because they were part of Plaintiff's offer for a line of credit and part of *every* invoice, including the instant one, Defendant signed.

■ Defendant not only objects to the inclusion of these service costs terms but also objects to Plaintiff's interpretation of these terms. At the outset, the Court notes where a contract is plain and unambiguous, there is no room for alternative constructions. *Board of Trustees of State College v. Sherman*, 280 Md. 373, 373 A.2d 626 (1977).

In the instant case, the contract states that Mr. Katski "agrees to pay a service charge of 1½% monthly (18% per annum) on all balances 30 days past due, which would be added to the balance due." *See* Plaintiff's Exhibits 1 & 15. These interest payments are unambiguous and part of the terms to which Defendant agreed. This Court finds that the finance charges from October 1, 1990 (when Plaintiff began calculating them after submitting the July invoice) till May 31, 1992 are $9,044.58. Further, the finance charges continue to accrue at a daily rate of $18.26 in June. Accordingly, the Court finds Defendant liable for these changes until payment is made to Plaintiff.

■ The service costs also include "reasonable attorney's fees of 20% collected by suit or otherwise." *See* Plaintiff's Exhibits 1, 3 and 15. Johnson & Towers' fees appear to the Court to be reasonable. They are also part of the terms to which Defendant agreed. Plaintiff made numerous efforts to collect without resorting to the Courts. *See* Plaintiff's Exhibits 3 through 15. Further, Ms. Gerben, who oversees billing for Plaintiff, testified in addition to the written notices, repeated telephone

---

1. The contract in relevant part states, "I request credit at your company and agree to payment terms of Net 30 days. In the event that the amount is past due for a period of 30 days, I agree to pay a service charge of 1½% monthly (18% per annum) on all balances 30 days past due which would be added to balance due. In the event that it becomes necessary to place this account in the hands of an attorney for collection, then I agree to be liable for said cost, including costs and attorney's fees of twenty (20%) percent." Plaintiff's Exhibit 1.

calls were made in an effort to collect. Ms. Gerben testified that Defendant was even advised that if he was dissatisfied with Plaintiff's work, he could, until the matter was resolved, withhold a ten percent payment until he was satisfied. Defendant neither paid nor attempted any alternatives to full payment. Instead, Defendant ignored Plaintiff's requests. The Court finds that Defendant is liable for the agreed upon attorney's fees of twenty percent of the amount collected. As of May 31, 1992, the attorney's fees for which Defendant is liable total $7,302.77. Further, the fees continue to accrue at a rate of $3.65 per day in June and will continue at the rate of 20% of the outstanding balance until paid by Defendant.

The final element of the service costs included all costs of collecting the obligation. *See* Plaintiff's Exhibits 1, 3 and 15. Many of these costs may in fact be recoverable in Rule 54(d). *See* Fed.R.Civ.P. 54(d). However, the costs associated with collecting this debt are also recoverable under the contract terms. The Court finds the costs Plaintiff lists to be reasonably and necessarily incurred as a result of Defendant's failure to pay. Accordingly, the Court awards Johnson & Towers the full amount of their costs of $6,270.92.

B. *Third Party Plaintiff's Claim Against New Hampshire Insurance Group*

As a Third Party Plaintiff, Mr. Katski brings suit against his insurance company, New Hampshire Insurance Group ("NHIG"). Third Party Plaintiff claims the damage done to his yacht is covered by his insurance policy with NHIG and NHIG is, therefore, liable for the repairs. In addition, because of NHIG's refusal to pay, Mr. Katski claims that NHIG is liable not only for the repair invoice amount, but also for the service costs that accrued under the contract terms between Mr. Katski and Johnson & Towers and all of his attorney costs.

NHIG denies that the repairs are covered by the insurance policy. As a result, NHIG denies all of Mr. Katski's damage claims. Further, NHIG argues that even if they are liable for the repair work, they are not liable for any of the invoice servicing fees or Mr. Katski's attorney's fees. NHIG contends that under the policy terms, Third Party Defendant is not obligated to indemnify Mr. Katski for any obligations he assumed when he signed the credit-finance agreement with Johnson & Towers. Further, NHIG argues that Mr. Katski could have mitigated damages by paying the invoice as he was obligated to do under his contract with Johnson & Towers.

Since all of NHIG's liability is contingent upon whether the damage to the vessel Hunter is covered by Mr. Katski's insurance policy, the Court will turn first to this issue. The policy states that it covers the "yacht along with its sails, machinery, furniture and other equipment of and in the vessel as is required aboard for the safety and operation of the vessel." *See* Defendants' exhibit 7 Insurance Policy Section "A" paragraph 1. Without a doubt, this policy covers the yacht's engines as they are both machinery and required for the vessel's operations. Moreover, this section would cover the lagging and the engine insulation as they are necessary for the safe operation of the vessel.

NHIG claims that paragraph 7(b) under Section A of the policy excludes insurance coverage on items where the damage is due to "wear and tear, gradual deterioration, weathering." NHIG claims that the engine damage resulted from the normal wear and tear and gradual deterioration of the lagging (the cloth which wraps around the insulation) and the engine insulation.

Mr. Katski claims that the damage is covered by paragraph 6 of Section "A" of the policy. In relevant part, paragraph 6 states, Causes of Loss That Are Covered:

(a) We will cover accidental direct physical loss or damage to the property insured from any external cause.

(b) We will also cover physical loss or damage caused by the following:

(2) Negligence of master, mariners, engines or pilots, provided such loss or

damage is not due to a lack of diligence by [the policy holder].

(3) any hidden defect in the machinery ...

Mr. Katski claims that negligence of those who repaired the Hunter caused the damage and that this negligence is covered by one of several provisions in paragraph 6. As a factual matter, therefore, this Court must decide whether the insulation's damage is a covered loss under paragraph 6 or is the result of wear and tear that, as stated in paragraph 7(b), is not a covered loss under the policy.

This Court finds that a preponderance of the evidence demonstrates that the damage to the lagging and the engine insulation was due to physical abuse and not gradual deterioration or wear and tear. Further, this abuse to the engine insulation, this Court finds, by a preponderance of the evidence, was not due to Mr. Katski's negligence. These findings of fact are based on the following evidence. Mr. Katski presented the testimony of two expert witnesses, Commander Lynch and Dr. John Allen, both of whom testified that the engine insulation does not wear out. Both testified that only some repeated physical trauma could cause the lagging to tear and crush the fibrous material that composes the insulation. Once crushed, the insulation was then ingested into the engines, which all experts agree caused the engine damage.

Commander Lynch has twenty years of Naval experience on ships, with particular expertise in this type of engine insulation. Dr. Allen has a Doctorate in Aeronautical Engineering and Engineering. Both witnesses testified that the only causes of the failure of the lagging which would allow the dust to escape are physical trauma or submersion in water. Since the engine room never flooded, these experts testified only physical trauma could have caused the lagging to fail and the insulation to crumble as it was compressed by the physical abuse. The Third Party Plaintiff's expert testimony is supported by the Johnson & Towers mechanics who repaired Mr. Katski's yacht engines. They testified the lagging and insulation needed no maintenance.

Only the testimony of NHIG's marine surveyor, Mr. Skord, contradicts this conclusion. Mr. Skord testified that in his opinion, the lagging has an expected useful life of three to ten years. While the Court finds Mr. Katski's experts, on balance, more credible on the specific issue of the life expectancy of insulation and lagging, there is other evidence that calls Mr. Skord's testimony into question.

Mr. Katski testified that the only portions of the lagging and insulation replaced were on a horizontal section of pipe. This section as Mr. Katski testified, and the diagrams and photographs showed, would be a convenient foot rest for stepping on when leaving the engine room, or seat when working on certain parts of the engine. None of the vertical portions of the lagging and insulation were replaced. Moreover, the Court examined damaged and undamaged lagging and insulation. The replaced portions from the horizontal sections were crushed, while the portion from the vertical section was not. *See* Defendant's Exhibits 20 and Third Party Defendant Exhibit 4. If Mr. Skord were correct in his assessment of the useful life of lagging and insulation, the damage should not have been confined, but would instead have been present in other areas besides those places that made convenient steps or seats.

Finally, there is direct evidence of physical trauma. Mr. Katski testified that he saw a Johnson & Towers' employee step on the engine insulation. While this one event is not sufficient to establish Plaintiff's liability, it does support Mr. Katski's contention. Further, Mr. Katski presented photographs of the horizontal portion of the engine exhaust taken during boat repairs done, not by Plaintiff, but by another yacht repair company. The photographs showed foot prints on the engine exhaust—the horizontal portions of the engine insulation system. Mr. Katski testified that there were at least eight major repair jobs done on the Hunter engines between 1986 and 1990. The repair work was done by a variety of yacht repair companies, any of whom may

have stepped on the lagging and compressed the engine insulation.

The repairs done by yacht repair companies in January and March of 1990 may be the most likely culprits for causing the insulation, and ultimately, the engine damage.[2] Commander Lynch testified that it would have taken approximately six months between the time the particles began to escape from the insulation until the engine began to show signs of damage. Six months after the January repairs, Johnson & Towers was asked by Mr. Katski to examine the engines. Moreover, Mr. Katski, as already mentioned, had photographs taken during the January 1990 repairs that showed footprints on the engine exhaust where the insulation ultimately needed replacement.

The Court rules out Mr. Katski as a possible source of the damage. First, there is no evidence that he ever stepped or sat on the damaged parts. Mr. Katski testified that he did not. Second, although Mr. Katski constantly worked in the engine room, everyone who testified, including Johnson & Towers' employees, stated that Mr. Katski takes great measures to keep his engine room clean and his yacht in good condition. Given this evidence, the Court finds by a preponderance of the evidence that the lagging and engine insulation did not suffer from wear and tear or gradual deterioration. Instead, the Court finds by a preponderance of the evidence that physical abuse caused the lagging that covered the insulation to separate. Physical abuse, the Court finds by a preponderance of the evidence, compressed the insulation causing it to break off in particles and the particles were then ingested by the intake of the engine causing the engine damage.

■ Having established that physical trauma, not gradual deterioration, caused the insulation and ultimate engine damage, it now remains for the Court to examine whether this physical abuse is covered by the insurance policy. If the damage is a covered loss, then NHIG is responsible under the insurance policy for at least the invoice amount. If this type of damage is not covered, then NHIG is not liable at all to Mr. Katski. The Court turns, therefore, to an examination of Mr. Katski's policy.

An insurance policy is a contract and is to be interpreted as any other contract, with the terms given their customary and ordinary meanings. *See Highlands Ins. Co. v. Gerber Products Co.,* 702 F.Supp. 109 (D.Md.1988); *Chicago Ins. Co. v. Pacific Indemnity Co.,* 502 F.Supp. 725 (D.Md. 1980); *Bankers & Shippers Co. v. Urie,* 38 Md.App. 232, 380 A.2d 243 (1977). Moreover, an insurance policy is to be construed as a whole with specific clauses qualifying the general clauses. *Fed. Ins. Co. v. Allstate Ins. Co.,* 275 Md. 460, 341 A.2d 399 (1975). Finally, where policy terms are ambiguous, the Court must consider extrinsic evidence of the parties' intent and usage. *Southern Maryland Agricultural Assn. v. The Bituminous Casualty Corp.,* 539 F.Supp. 1295, 1299 (D.Md.1982). Should the ambiguity still be unresolved, then the "policy is construed against the insurer, as the party which drafted the agreement, and in favor of coverage for the insured." *Id.*

In the instant case, Mr. Katski claims coverage under several provisions of paragraph 6 of Section "A" of the policy. NHIG denies coverage because it claims the damage is due to the gradual deterioration or the wear and tear of the engine insulation and lagging. Such damage is not covered by the policy terms. *See* Section "A" paragraph 7(b). In addition, NHIG denies that the negligence of the repairman can fall within any of the provisions in Section "A" paragraph 6 of the policy.

The Court disagrees with NHIG. The Court has already found that physical abuse, not wear and tear, caused insulation damage. The policy exclusions in Section "A" paragraph 7(b) do not apply. *See Cyclops Corp. v. The Home Insurance Co.,* 352 F.Supp. 931, 936 (D.W.D.Pa.1973) ("wear and tear" defined as that ordinary

---

**2.** Testimony reveals that the Hunter was subject to repairs not only in Florida but in transit on the inland water way from Florida to Maryland, at which time the engines and lagging were exposed.

and natural deterioration or abrasion that an object experiences by its *expected* contacts during its *natural* life expectancy). Since the life of the lagging and insulation was expected to last decades, exceeding even the life of the yacht, and since physical abuse from stepping and sitting on the insulation and lagging is not one of the expected contacts, the Court holds that the policy exclusions to which NHIG points do not apply.

■ NHIG claims that negligent repairmen are not covered within the policy protection in Section "A" paragraph 6 coverage for damage to the vessel from any external cause or the negligence of engineers. The Court disagrees. Paragraph 6(a) covers accidental physical damage from *any external cause*. While this provision most certainly covers damage due to the traditional perils of the sea, mechanics or engineers who are brought on board to repair the engines would certainly be an external cause. This abuse of the insulation was an accidental consequence of the repairs they made to the engines. *See Goodman v. Fireman's Fund Insurance*, 600 F.2d 1040, 1042 (4th Cir.1979) ("If the loss did not result from inherent defect, ordinary wear and tear, or intentional misconduct, its cause was necessarily external."). In the instant case, as in *Goodman*, the Court is faced with interpreting a clause that is written very broadly. *Id.* In *Goodman*, the policy covered "all risks ... of physical damage from any external cause." *Id.* at 1041. Here, the policy covers "accidental direct physical ... damage ... from any external cause." *See* Defendants' Exhibit 7 Section "A" paragraph 6(a). As with all risks, accidental damage should be construed as losses that are fortuitous, covering the negligence of repairmen. *Id.* at 1042; *Cf., Nautilus Virgin Charters, Inc. v. Edinburgh Ins. Co.*, 510 F.Supp. 1092, 1096 (D.Md.1981) (a provision in an insurance policy covers "all risks from any external cause" held to include barratry of the master or the crew). In the instant case, the negligence is from a source more external than the vessel's "master and crew," *i.e.*, from the mechanics hired to repair the engines. Further,

there is no evidence of intentional abuse to the lagging and insulation. *Cf. Nautilus Virgin Charters*, 510 F.Supp. at 1096–97.

■ Further, to the extent that any ambiguity remains as to whether the negligence of mechanics is covered under paragraph 6(a), this Court resolves the ambiguity in Mr. Katski's favor. *See Bituminous Casualty Corp.*, 539 F.Supp. at 1299. Finally, the Court notes that Mr. Katski's case is not at all hampered by the fact that he has failed to identify the exact cause of the physical abuse. Mr. Katski has met his burden. He established by a preponderance of the evidence that the loss is within policy coverage. *See Gibbar v. Calvert Fire Ins. Co.*, 623 F.2d 41, 45–46 (8th Cir. 1980).

■ Having established that the damage to the Hunter is within policy coverage, NHIG is liable to Mr. Katski at least for the repair invoice amount of $27,469.25. *See* Plaintiff's Exhibit 3, the July 25, 1990 invoice sent to Mr. Katski. NHIG breached its insurance contract with Mr. Katski when they failed to pay for the repairs done by Johnson & Towers to Mr. Katski's yacht. The Court must examine next for which of Third Party Plaintiff's additional damage claims NHIG may be liable to Mr. Katski, because of Third Party Defendants' breach of contract.

■ In addition to the invoice amount, Mr. Katski seeks all of his attorney's fees as well as the service costs for which Mr. Katski is liable to the Plaintiff, because of his failure to make timely payment to Johnson & Towers. These service costs include the interest payments, costs, and part of Plaintiff's attorney's fees.

The rule for the measure of damages for breach of contract, as laid down in England by Baron Alderson in the leading case of *Hadley v. Boxendale*, 9 Exch. 341, 5 Eng.Rul.Cas. 502, 504, has been adopted in the State of Maryland as well as generally by the Courts of the United States. The rule is that the amount of damages recoverable for breach of contract is such as may reasonably be considered in arising naturally from the

breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract, as a probable result of the breach of it.

*Cohen v. American Home Association Co.,* 255 Md. 334, 362, 258 A.2d 225 (1969) (citing *Casualty Ins. Co. v. Messenger,* 181 Md. 295, 300–01, 29 A.2d 653 (1943)).

Under this standard, Mr. Katski is entitled to recover his attorney's fees from NHIG. Paragraph 7 of General Conditions states that where the loss is covered by the policy, NHIG will pay for the legal fees. Further, Section "B" paragraph 3 of the policy states, "Legal Representation: If your liability is contested, we will pay the cost and expense of your defense." This more specific provision clearly makes NHIG responsible for legal fees when Mr. Katski is liable.[3]

Under Maryland law, "[i]f an insurer breaches its contractual duty to defend a claim that falls within or potentially falls within the policy's coverage, the insurer is liable for attorney's fees incurred in the underlying defense of that claim, as well as in a declaratory judgment action which determines the coverage and the duty to defend." *American Home Assurance v. Osborn,* 47 Md.App. 73, 84, 422 A.2d 8 (1980); *see also Bankers & Ship Ins. Co. of New York v. Electro Enterprises,* 287 Md. 641, 646–49, 415 A.2d 278 (1979); *Cohen,* 255 Md. at 360–62, 258 A.2d 225; *Messenger,* 181 Md. at 300–02, 29 A.2d 653.

The instant case satisfies these conditions. Mr. Katski's claim fell within his policy coverage and NHIG had a duty to defend. In fact, it was NHIG's failure to pay that generated the suit. Under these circumstances, Third Party Plaintiff's legal expenses are consequential damages that "may reasonably be supposed to have been in the contemplation of both parties at the time they made this contract ..." *Messenger,* 181 Md. at 300, 29 A.2d 653. This Court finds that NHIG is liable for all of Mr. Katski's reasonable attorney's fees, both those reasonable fees incurred in the action between Mr. Katski and Plaintiff, as well as his reasonable legal fees incurred in his Third Party claim against NHIG. The Court directs Mr. Katski to submit his attorney fee's bill to the Court and further directs NHIG to prepare any response it may wish to bring only on the reasonableness of Mr. Katski's fees.

█ █ Next the Court considers the service charges assessed against Mr. Katski because of his failure to pay Johnson & Towers. On the one hand, these charges were assessed against Mr. Katski because of NHIG's failure to pay Mr. Katski's claim. Under Maryland law the Court should endeavor to place the injured person in a position in which he would have been had the contract been properly performed. *Messenger,* 181 Md. at 301–02, 29 A.2d 653. Had NHIG properly performed these service charges would not have been incurred by the Defendant.

█ However, Maryland law only allows those damages that may reasonably have been in the contemplation of both parties at the time the contract was made. *Id.* at 301, 29 A.2d 653. Further, "[o]rdinarily a plaintiff in an action on an insurance policy cannot recover special damages for the detention of money due to him under the policy beyond what the law allows as interest." *Id.* In the instant case, Mr. Katski's insurance policy provides that NHIG will not be liable for obligations incurred by the insured under another contract. *See* Defendant's Exhibit 7 Section "B" paragraph 7(b). Mr. Katski assumed the service charges when he signed the credit agreement with the Plaintiff. These obligations were Mr. Katski's independent of, and prior to, any insurance policy he had with NHIG. Neither the interest charges nor the Plaintiff's attorney fees are part of his contract with NHIG.

█ █ Moreover, Mr. Katski could have mitigated at least part of the dam-

---

**3.** In fact, the General Conditions in paragraph 9 states that Mr. Katski must do everything to protect his right to recover from someone else and once NHIG pays him, the right to recover from third party belongs to NHIG. Under this policy, if NHIG had paid the cost of repairs, it would have "inherited" any claim against Johnson & Towers.

ages. Mr. Katski could have paid the Plaintiff and then sued NHIG. Mr. Katski could, without paying Plaintiff, have brought suit against NHIG when it initially notified him that it would not pay for the repairs. Either of these options would have limited his damages, NHIG's damages and Plaintiff's damages. Instead, Mr. Katski ignored Plaintiff's many requests for payment or for constructing some alternative solution. It was only this suit, instituted by Plaintiff, that animated Mr. Katski's concern over his debt. Maryland law requires that a plaintiff take reasonable steps to minimize the amount of damages. *See Schlossberg v. Epstein*, 73 Md.App. 415, 420, 534 A.2d 1003 (1988). Mr. Katski did not take these steps. Indeed he did nothing.

Since these service costs for nonpayment, with one exception, were not within the reasonable contemplation of the parties at the time of the contract's making and these damages could have, to some extent, been mitigated by Mr. Katski, the Court partially denies Mr. Katski's request for their reimbursement. In particular, the Court denies Mr. Katski's request for reimbursement of the monthly interest charges that accrued and that portion of Plaintiff's attorney's fees for which Mr. Katski is separately responsible under the credit agreement he signed with Johnson & Towers.

■ The Court grants Mr. Katski's request for a portion of the $6,270.92 in Plaintiff's costs assessed against him. While Plaintiff recovered these costs under the terms of its contract with Mr. Katski, many of these items are also recoverable under Rule 54(d). Fed.R.Civ.P. 54(d). The costs that are recoverable under Rule 54(d) are also part of Mr. Katski's litigation costs in defending his action against Plaintiff. Therefore, these costs should be recoverable along with Mr. Katski's attorney's fees. *Cf. American Home Assurance v. Osborn*, 47 Md.App. at 84, 422 A.2d 8. Mr. Katski is directed to submit his request to the Clerk of the Court, along with any other Rule 54(d) costs. The Clerk of the Court will make a determination as to which of Plaintiff's costs and any other costs Mr. Katski submits may be charged under Rule 54(d) and therefore reimbursable from NHIG to Mr. Katski.

III. *Conclusion*

The Court finds that Plaintiff is entitled to payment for repair work done by Johnson & Towers on the vessel Hunter. Further, Plaintiff is entitled to all service costs requested pursuant to its contracts with Mr. Katski.

The Court finds that the repair work done on the Hunter in June and July of 1990 is covered under the terms of Mr. Katski's insurance policy with NHIG. As such NHIG is liable to Mr. Katski for the full amount of the invoice. NHIG is also liable to Mr. Katski for all of his reasonable attorney's fees which are to be submitted to this Court for its determination. Finally, NHIG is liable to Mr. Katski for any of the costs that Plaintiff could have recovered under Rule 54(d), in addition to any other Rule 54(d) costs for which NHIG be liable to Mr. Katski in prevailing in his Third Party claim. However, NHIG is not liable to Mr. Katski for any of Plaintiff's attorney's fees or the interest charges assessed by Plaintiff against Mr. Katski.

A separate Order shall issue.