928 F.2d 399
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
QUAKER STATE OIL REFINING CORPORATION, a Delaware
Corporation, Plaintiff-Appellee,
v.
NATIONAL FULFILLMENT SYSTEMS CORPORATION, a Maryland
Corporation, Defendant-Appellant.
 No. 90-2323.
 United States Court of Appeals, Fourth Circuit.
 Argued Nov. 1, 1990.
Decided March 14, 1991.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, District Judge. (CA-88-745-JFM)
 William T. Wood, Law Offices of William T. Wood, Rockville, Md., argued for appellant.
 Robert Donald Maack, Campbell, Maack & Sessions, Salt Lake City, Utah, argued for appellee; Martin R. Denney, Cynthia K.C. Meyer, Campbell, Maack & Sessions, Salt Lake City, Utah; John Henry West, III, Ober, Kaler, Grimes & Shriver, Baltimore, M., on brief.
 D.Md.
 AFFIRMED.
 Before K.K. HALL and MURNAGHAN, Circuit Judges, and CACHERIS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PER CURIAM:
 
 
 1
 This case concerns a 1984 promotion by Quaker State Oil Refining Corporation ("Quaker State") known as the "Million Dollar Giveaway." Quaker State planned to award one million dollars to the lucky person who found in his newspaper a Quaker State insert that bore a unique slogan. Quaker State had hired National Fulfillment Systems, Inc. ("NFS") to handle the claims submitted for the prize, because these sort of contests generate many fraudulent claims. NFS was responsible for judging the authenticity of the submitted inserts, and for documenting each submission by photocopying so that fraudulent claims could be disproved. NFS also agreed to hold Quaker State harmless against any liability that might arise if NFS failed to perform its contractual duties.
 
 
 2
 On June 6, 1984, Burke Stone submitted an insert and claimed the prize. Both Vernon Tate, the President of NFS, and Donna Walbert, NFS's contest judge, recall that the submission was invalid. Unfortunately, NFS failed to photocopy Stone's submission, and as Murphy's law dictates, Stone filed suit in Utah against Quaker State claiming the prize. Quaker State attempted to implead NFS as the responsible party. However, NFS claimed that it was not subject to personal jurisdiction in Utah, and the third-party claim was dismissed on that ground. Quaker State ultimately settled Stone's suit for $60,000 on the eve of trial.
 
 
 3
 Quaker State then filed this action seeking indemnity for the settlement amount, plus attorneys' fees. By a series of summary judgment motions, Quaker State was awarded the $60,000 and its attorneys' fees and costs incurred in the Utah suit and the suit below. In addition, NFS lost a summary judgment motion in which it claimed that the Maryland suit was time-barred. NFS appeals these rulings. We affirm.
 
 I.
 
 4
 NFS argues that it was entitled to a determination of whether Stone was the winner of the contest before Quaker State was granted summary judgment for the settlement amount. NFS seeks a remand and a hearing on this issue.
 
 
 5
 Summary judgment is properly granted when there is no genuine issue of material fact disclosed by the available evidence. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). In the case at bar, the indemnity clause of the parties' contract made NFS liable for any of its errors in handling prize claims:
 
 
 6
 NFS agrees to indemnify Quaker State and hold it harmless from any liability whatsoever arising out of or in any way connected with or relating to, the acts or omissions of NFS or its agents, including the reasonable cost of Quaker State's defending itself against such liability.
 
 
 7
 (Emphasis added.)
 
 
 8
 All of the available evidence indicated that Stone was not a true winner. In fact, the most significant evidence of invalidity came from NFS. Both Tate and Walbert testified that they were "positive" that Stone did not submit the winning insert. In addition, Tate admitted in his deposition that NFS "dropped the ball" by failing to make a copy of Stone's submission. All told, NFS produced no evidence indicating that Stone might have prevailed at trial. Accordingly, there was no genuine issue of material fact to be decided, and summary judgment was properly granted.
 
 II.
 
 9
 NFS also claims that the summary judgment granted to Quaker State for the settlement amount was improper because NFS was not given a chance to aid in the defense of the Utah suit. More specifically, NFS contends that Tate and Walbert flew to Utah in order to aid Quaker State in defending the claim, and yet, before they arrived, Quaker State settled the suit. NFS infers that the settlement amount was unreasonable, and that the settlement amount would have been lower if NFS had participated.
 
 
 10
 This argument is frivolous. On several occasions, Quaker State requested that NFS assume control of and liability for the Utah suit. Instead, NFS obtained its own dismissal from that suit on personal jurisdiction grounds. NFS did explore the possibility of a settlement of Quaker State's claim versus NFS (and offered a bad deal given the language of the indemnity clause); however, NFS never accepted Quaker State's offer to assume responsibility for Stone's claim. Furthermore, Quaker State settled with Stone just hours before the trial was to begin. Given NFS's prior intransigence, there was no reason for Quaker State to wait for NFS's assistance at that late date. Thus, the district judge properly granted summary judgment on the issue of whether the settlement amount was reasonable.
 
 III.
 
 11
 NFS next argues that the district judge erred in granting summary judgment for Quaker State on the issue of the reasonableness of the attorneys in both the Utah and Maryland cases. In total, the district judge granted attorneys' fees of $142,784 and out-of-pocket expenses of $32,283.87. He found that the fees and costs were reasonable for several reasons: (1) The $175,067.87 total was a small percentage of the total possible liability--$1.4 million (a million dollar prize plus $400,000 in prejudgment interest); (2) the fees were paid by a sophisticated client (Quaker State) which was conscious of litigation expense, and this cost-consciousness was demonstrated by Quaker State's negotiating down of the lead Utah counsel's fee from the usual $125 an hour to $115 an hour; and (3) the number of hours worked and the hourly rates charged did not appear "unreasonable."
 
 
 12
 In opposition to the summary judgment motion on the reasonableness of the fees, the defendant produced the following evidence and arguments: (1) NFS's fees were allegedly lower--a total of $56,495 in defense of the Utah suit and the action below; (2) NFS alleges that Quaker State tremendously overlitigated the issue of personal jurisdiction over NFS in Utah, because there was no arguable basis for jurisdiction over NFS; (3) Quaker State's litigation expenses should have been lower because NFS supplied some case law research to Quaker State; and (4) NFS supplied an affidavit from a litigation expert who opined that Quaker State's fees were excessive.
 
 
 13
 Ordinarily, the issue of the reasonableness of attorney fees is very fact-based; thus, it should be rarely suitable for summary judgment. Yet, the defendant must come forward with some evidence of his own to show that there is a genuine and material factual controversy. Celotex, supra. This was not done.
 
 
 14
 One would expect that the affidavit by the litigation expert, Albert D. Brault, to be sufficient to create a factual controversy. However, Brault only stated that he was an experienced attorney, that he reviewed the papers filed in the case, and that he has concluded that the fees were "excessive" and "unreasonable and should not be awarded." Brault offered no facts or rationale to support this conclusion. The district judge correctly held that such a conclusory affidavit was insufficient.
 
 
 15
 Furthermore, comparing the litigation expenses of Quaker State and NFS is comparing apples and oranges. In the Utah suit, Quaker State had to litigate the personal jurisdiction issue with NFS and defend the case against Stone. While NFS may have supplied some case law research in order to aid Quaker State, NFS did not demonstrate that it bore the same litigation burden carried by Quaker State.
 
 
 16
 The remaining allegation is that Quaker State over litigated the personal jurisdiction issue. This allegation is composed of two arguments. First, NFS contends that Quaker State should have conceded the lack of personal jurisdiction over NFS because there was no basis for such jurisdiction. We agree with the district judge that Quaker State's argument for personal jurisdiction over NFS in Colorado was justified (albeit ultimately unsuccessful) under Burger King Corp. v. Rudzewicz, 471 U.S. 462 (1985). On appeal, NFS only states that the opposition was unreasonable, but it does not explain why.
 
 
 17
 Second, NFS contends that Quaker State was unreasonable in spending $22,000 in attorneys' fees in litigating the personal jurisdiction issue. Yet, this is less than the $30,495.93 that NFS spent in the Utah litigation, an amount presumably composed almost entirely of fees incurred in opposing personal jurisdiction, since NFS never confronted any other issues in that suit. This comparison undermines NFS's argument. NFS contends that the fees incurred by Quaker State in litigating this issue must have been higher, but it has not produced any evidence to back up these doubts. Thus unchallenged, the $22,000 figure must stand. Accordingly, the district judge properly granted summary judgment on the issue of the reasonableness of the attorneys' fees.
 
 IV.
 
 18
 NFS also argues that Quaker State is not entitled to attorneys' fees for the Maryland action below as a matter of law. Admittedly, the general rule in Maryland is that the prevailing party may not recover attorneys' fees unless provided for by statute or contract. American Home Assurance Co. v. Osbourn, 47 Md. 73, 83, 422 A.2d 8, 14 (1980); Empire Realty Co. v. Fleisher, 269 Md. 278, 285-86, 305 A.2d 144, 148-49 (1973). Yet, based upon the contract between Quaker State and NFS, we agree that Maryland law permitted such an award.
 
 
 19
 As noted supra, the contract provided that NFS would pay "the reasonable cost of Quaker State defending itself against such liability." Under Maryland law, this provision entitled Quaker State to recover its attorneys' fees in the suit below because NFS shirked its responsibility to pay for the attorneys' fees in the Utah litigation. This is demonstrated by Maryland insurance cases. If an insurer wrongly refuses to defend its insured, the insured may recover its attorneys' fees in the suit pressed by the third party and the attorneys' fees incurred in the insured's subsequent suit against the insurance company. The Travelers Indemnity Co. v. Insurance Co. of North America, 69 Md.App. 664, 679-80, 519 A.2d 760, 767-68 (1987); American Home, 422 A.2d at 14-15; Bankers and Shippers Ins. Co. of New York v. Electro Enterprises, Inc., 287 Md. 641, 648-49, 415 A.2d 278, 282-83 (1980).
 
 
 20
 The rationale for this rule is that insurance contracts make two promises to insureds: (1) that the insurer will pay a covered claim, within policy limits, and (2) that the insurer will defend (at its own expense) any claim against the insured that is arguably within the policy's terms. American Home, 422 A.2d at 14; Bankers and Shippers, 415 A.2d at 282. This attorneys' fees exception to the American Rule arises from the latter promise. The insurer has impliedly "authorized" the suit against it (and agreed to pay the attorneys' fees) by its failure to defend the initial suit brought by the third party. Travelers, 519 A.2d at 768. There is no difference between the promise to defend in an insurance case and the agreement of NFS to pay attorneys' fees in the case at bar. Accordingly, the district judge correctly held that Maryland law permitted the recovery of the attorneys' fees in the suit below.
 
 
 21
 The essence of this ruling was captured by the district judge, and his words are worth repeating:
 
 
 22
 Although NFS professed in Utah (as it professed here) its intention to assist Quaker State, it clearly was willing to do so only on its own terms. Despite the admissions on deposition of its representatives that their own error in failing to copy the gamepiece mailed in by Burke Stone is what created Quaker State's potential liability, NFS has fought Quaker State at every turn. Its actions have spoken louder than its words, and thus institution of this action was necessary to make it confront the consequences of its own actions.
 
 V.
 
 23
 Finally, NFS argues that the Maryland suit was time-barred. The parties agree that a three-year statute of limitations applies. See Md. Courts and Judicial Proceedings Act Sec. 5-101 (1984). The issue is when did the cause of action accrue? If it accrued when Stone filed his lawsuit (as appellant claims) then the suit below was barred. If it accrued when the Utah suit was settled (as the district judge held and as Quaker State argues on appeal) then the suit was not barred. The latter position is the correct one.
 
 
 24
 In Levin v. Friedman, 271 Md. 438, 317 A.2d 831 (1974), the Maryland Court of Appeals divided indemnity contracts into three groups and addressed when a cause of action would accrue for each group. The three types of indemnity contracts are: (1) indemnity against liability ("liability indemnity"), (2) indemnity against loss or damage ("strict indemnity"), and (3) a promise by the indemnitor to perform a specific act ("specific act indemnity").
 
 
 25
 Although Levin did not draw crystal-clear distinctions between these three categories, this is a case of liability indemnity. As the name implies, liability indemnity exists where someone agrees to satisfy a certain liability that may be incurred by someone else. This took place here; NFS agreed to hold Quaker State harmless against any liability that might befall Quaker State due to NFS mistakes in running the claims process. With liability indemnity, the cause of action accrues "as soon as liability is legally imposed, as when judgment is entered, even though at that point no actual loss has been sustained and the judgment has not been paid." 317 A.2d at 834. In other words, as soon as one is obligated by a judgment or similar state mandate of payment, then the cause of action accrues. Under this method of determining the accrual date, this suit was timely filed.
 
 
 26
 NFS argues that the indemnity contract belongs in the third category, specific act indemnity. "Specific act indemnity" is "a promise of the indemnitor to perform a certain act or to make specified payments for the benefit of the indemnitee." 317 A.2d at 834. In this situation, the indemnitor promises to do certain things or take care of certain contingencies should they arise, thereby protecting the indemnitee from having to do these things. With this category of indemnity, the cause of action accrues as soon as the indemnitor fails to perform that certain act required. This is the only category of indemnity under which the Maryland action would have been time-barred. Yet, the indemnity contract in the case at bar did not require NFS to do a specific act; instead, it merely placed any liability for errors in handling the prize claims on NFS's shoulders. Thus, the district judge correctly held that the statute of limitations had not run.
 
 
 27
 In sum, because the appellant has not demonstrated any errors in the proceedings below, the judgment is
 
 
 28
 AFFIRMED.