16 F.3d 411
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
 ST. PAUL FIRE AND MARINE INSURANCE COMPANY, Plaintiff-Appellant,
v.
James Murray FALLON, III; Hartford Accident and Indemnity
Company; Continental Insurance Company,
Defendants-Appellees,
and
Edward GORMAN; Audrey Gorman; James Murray Fallon, Jr.;
Aetna Casualty & Suretty Company; Stephan Fuegi;
Frank Owens; Martha Owens, Defendants.
 No. 93-1757.
 United States Court of Appeals, Fourth Circuit.
 Jan. 21, 1994.
 
 Appeal from the United States District Court for the District of Maryland, at Baltimore. John R. Hargrove, District Judge.
 Richard McMillan, Crowell & Moring, Washington, DC.
 Thomas Michael Preston, Anderson, Coe & King, Baltimore, MD.
 Joseph Alfred DePaul, Goldstein & Baron, Chartered, College Park, MD.
 Stephen P. Taub, David Batty, Crowell & Moring, Washington, DC.
 Jeffrey R. Schmieler, Saunders & Schmieler, Silver Spring, MD.
 D.Md.
 AFFIRMED.
 Before PHILLIPS and WILKINS, Circuit Judges, and KEELEY, United States District Judge for the Northern District of West Virginia, sitting by designation.
 OPINION
 PER CURIAM:
 
 
 1
 St. Paul Fire & Marine Insur. Co. ("St. Paul") appeals the grant of summary judgment against it in a multi-party insurance dispute arising out of a single car accident. We affirm.
 
 I.
 
 2
 On November 24, 1985, James Fallon, III ("Fallon"), a 19-year-old college student, was driving some friends home from a party in Annapolis, Maryland, when he lost control of his car and crashed it into a tree. Fallon was intoxicated at the time. Two of Fallon's passengers, Stefan Fuegi and Torin Owens, sustained serious and permanent injuries in the accident. In March of 1988, Fuegi and Owens filed suit against Fallon in federal court in Maryland, seeking millions of dollars in actual damages for injuries sustained in the accident, plus $25 million in punitive damages (the "Fuegi action").
 
 
 3
 Fallon claimed entitlement to $6.8 million in liability insurance coverage, under four separate insurance policies. Primary coverage was afforded by Aetna Casualty and Surety Co. ("Aetna"), under a $300,000 automobile liability policy issued to Fallon's father, James M. Fallon, Jr., who owned the car that Fallon was driving. A first layer of excess coverage was provided through a $500,000 policy issued by Continental Insurance Co. ("Continental") to Fallon's mother, Audrey Gorman, and a $1 million policy issued by Hartford Accident and Indemnity Co. ("Hartford") to Fallon's stepfather, Edward Gorman. A second layer of excess coverage was provided by a $5 million "umbrella" policy issued by St. Paul to Edward Gorman. The Gormans' policies with Continental, Hartford, and St. Paul were potentially implicated because they extended coverage not only to the named insureds, but also to persons related to them by blood or marriage who were residents of their households, and Fallon had been living with his mother and stepfather when not away at college.
 
 
 4
 Pursuant to its role as primary carrier, Aetna hired a lawyer to undertake Fallon's defense in the Fuegi litigation. From the beginning, Aetna, Continental, and Hartford assumed that their policies covered the claims being asserted by the Fuegi plaintiffs and regarded those claims as serious ones that threatened to expose their policy limits.
 
 
 5
 For nearly three years after the accident, St. Paul gave no indication to Fallon or the Gormans that it intended to dispute coverage. Approximately four months before the Fuegi case was scheduled to go to trial, however, Fallon admitted in deposition that he had moved out of the Gormans' home to live with his father several weeks before the accident. Immediately thereafter, in November 1988, St. Paul filed this declaratory judgment action in the United States District Court for the District of Maryland, seeking a declaration that its policy did not provide coverage because Fallon was not a resident of the Gorman household at the time of the accident. St. Paul named as defendants in this action its policyholder, Edward Gorman, his wife Audrey Gorman, Fallon's natural father, Fallon himself, and the three other insurance carriers with potential exposure, Aetna, Continental, and Hartford.
 
 
 6
 At the time St. Paul filed its declaratory judgment action, Aetna had already exhausted its policy limits in defense costs and medical payments. Accordingly, in late 1988 and early 1989, Fallon's attorney DePaul wrote several times to each of the remaining insurance companies--including St. Paul--demanding that they undertake Fallon's defense. He also warned each of the insurers that he believed his client's potential exposure exceeded their combined policy limits and demanded that they make an effort to settle the case. At approximately the same time, the Fuegi plaintiffs' lawyer made overtures to Fallon, Hartford, Continental, and St. Paul about settlement. St. Paul's attorney responded to both settlement inquiries by stating that St. Paul did not believe its policy provided coverage at all, and that in any event, it did not think it had any obligation to settle until Hartford and Continental committed their combined policy limits to a settlement, since any coverage it might have was not triggered until those policies were exhausted. St. Paul's attorney did state, however, that if Hartford and Continental decided to commit their policy limits in settlement, St. Paul wanted to participate actively in settlement negotiations and would consider contributing funds of its own to a joint settlement, so long as it could reserve the right to recoup those funds from the plaintiffs if it prevailed in the declaratory judgment action.[1]
 
 
 7
 At a court-ordered settlement conference on March 14, 1989, Hartford and Continental announced that they had reached a tentative settlement with the Fuegi plaintiffs, under which they would tender their combined policy limits (a total of $1.5 million), in exchange for the Fuegi plaintiffs' agreement to drop the $25 million punitive damages claim against Fallon. St. Paul's counsel objected to the proposed partial settlement on the ground that it did not provide for the release of the sizable compensatory damages claims against Fallon. There followed several days of further negotiation, during which counsel for Fallon and the two other insurers repeatedly attempted to get St. Paul to agree to commit its funds to a global settlement before the plaintiffs' offer of partial settlement expired. When St. Paul refused to make any offer of funds that was not conditioned on the outcome of its declaratory judgment action, Hartford and Continental, concerned that they would breach their duties to Fallon if they let the plaintiffs' partial settlement offer expire, went ahead and finalized the partial settlement on March 21, 1989. That left Fallon and St. Paul, as the only insurer with any remaining exposure, alone to face compensatory damages claims that were then estimated to be over $35 million.
 
 
 8
 At that point, St. Paul elected to undertake Fallon's defense in the Fuegi litigation, subject to a reservation of its right to contest coverage.[2] DePaul remained as Fallon's personal counsel because of his excess exposure. It continued to deny that it owed any coverage under the policy. In September of 1989, St. Paul settled the remaining claims of the Fuegi plaintiffs for $3.2 million, in exchange for a full release of Fallon. The settlement agreement contained provisions in which St. Paul denied coverage and purported to reserve its right to proceed with this declaratory judgment action and to assert any and all claims for indemnification, contribution, and/or reimbursement that it might have against any of the defendants in that action.
 
 
 9
 St. Paul's decision to settle the remaining claims against Fallon in the Fuegi litigation mooted its request for a declaratory judgment as to its coverage. St. Paul promptly amended its complaint in this action to delete its request for a declaratory judgment on coverage and to add claims for damages against Fallon, the Gormans, Aetna, Hartford, and Continental. JA 252-65.[3] The damages claims were based on allegations that the defendants had violated various duties allegedly owed to St. Paul by secretly negotiating a partial settlement with the Fuegi plaintiffs that left St. Paul alone to face massive compensatory damages claims.
 
 
 10
 St. Paul dismissed its claims against Aetna, and the remaining parties filed motions and cross-motions for summary judgment on the various claims and counterclaims asserted. At the same time, St. Paul sought leave to file a Third Amended Complaint, in which it withdrew its claims against the Gormans and converted its damages claims against Fallon into a request for a declaration that he had breached contractual duties of good faith and cooperation owed to it. The district court granted St. Paul leave to file the Third Amended Complaint before it ruled on the summary judgment motions. In that Third Amended Complaint, St. Paul asserted the following claims: (i) a claim against Fallon for breach of his contractual duties of good faith and cooperation to St. Paul; (ii) a claim against Hartford and Continental for breach of duties of good faith that they allegedly owed as underlying carriers to St. Paul as the excess carrier; (iii) a claim against Hartford and Continental for tortious interference with St. Paul's insurance contract; and (iv) a claim against Hartford and Continental for conspiracy to induce Fallon to breach his contractual duties to St. Paul.
 
 
 11
 Fallon counterclaimed against St. Paul for breach of its duty as excess carrier to make a good faith effort to investigate, settle, and defend the claims asserted against him by the Fuegi plaintiffs. For that alleged breach, Fallon sought both compensatory damages (including the attorney's fees he incurred in the defense of the Fuegi litigation and the declaratory judgment action) and punitive damages. Continental also counterclaimed against St. Paul, alleging that it had suffered tortious injury as a result of St. Paul's bad faith refusal to cooperate with, defend, and indemnify Fallon.
 
 
 12
 After a hearing on the various motions and cross-motions for summary judgment, the district court granted summary judgment to Fallon on St. Paul's breach-of-contract claim against him; granted summary judgment to Continental and Hartford on St. Paul's claims against them for tortious interference with contract, conspiracy to induce a breach of contract, and breach of an alleged duty of good faith; granted Fallon partial summary judgment on his counterclaim against St. Paul (specifically, his request for recovery of attorneys' fees incurred in his defense of the declaratory judgment action), but granted St. Paul summary judgment on all other aspects of Fallon's counterclaim against it; and granted summary judgment to St. Paul on Continental's counterclaim against it.
 
 
 13
 St. Paul's breach-of-contract claim against Fallon was based on a provision in its policy that gave it the option (but not the obligation) to participate in the defense and settlement of claims against its insured, and imposed upon the insured an obligation to "help [it] in any way you can" if it decided to do so.[4] St. Paul argued that Fallon had breached the duty of cooperation imposed upon him by this clause by deliberately excluding it from the negotiations leading up to the partial settlement. The district court interpreted the cooperation clause as requiring Fallon "to make a reasonable effort to notify the insurer of, and to include the insurer in, settlement negotiations." But it held that Fallon had satisfied that obligation as a matter of law, because the undisputed facts in the summary judgment record established that he had "attempt[ed] to include St. Paul in the settlement negotiations until it became apparent that the company had no interest in protecting [him], but was concerned exclusively with protecting its own interests ... [and] demanded that [he] place its interests above and beyond his own." Alternatively, the district court held that even if the cooperation clause "required Fallon to cooperate with St. Paul to a greater extent than he did," he would still be entitled to summary judgment, under a line of cases holding that an insured may "settle without the [insurer's] permission, in violation of contract provisions, where the insurer[ ] denie[s] all liability under the polic[y] in question," even though it does provide the insured with a timely defense. JA 1330, citing Great Am. Indem. Co. v. City of Corpus Christi, 192 S.W.2d 917 (Tex.Civ.App.1945); Thomas W. Hooley & Sons v. Zurich Gen. Acc. & Liab. Ins. Co., 103 So.2d 449 (La.1958); Hawkeye Cas. Co. v. Stoker, 48 N.W.2d 623 (Neb.1951); Franklin v. Oklahoma City Abstract & Title Co., 584 F.2d 964 (10th Cir.1978); Simon v. Maryland Cas. Co., 353 F.2d 608 (5th Cir.1965).[5] Having concluded that Fallon had not breached his contract with St. Paul, the district court then held that Continental and Hartford were entitled to summary judgment on St. Paul's related tort claims against them for tortious interference with its contract with Fallon and conspiracy to induce Fallon to breach that contract. The court reasoned that a showing that the contract in question had in fact been breached was an essential element of each of these torts under Maryland law. Because the court had already found that Fallon had not breached his contract with St. Paul, it concluded that Continental and Hartford could not, as a matter of law, be held liable for tortious interference with that contractual relationship or for conspiring to induce a breach of it.
 
 
 14
 The district court next addressed St. Paul's claim against Continental and Hartford for breach of a duty of good faith which St. Paul claimed that they owed, as underlying carriers, to St. Paul as excess carrier. The district court concluded that Continental and Hartford were entitled to summary judgment on this claim because they owed St. Paul no such duty. The district court reasoned that Continental and Hartford had no contractual relationship with St. Paul that could give rise to such a duty, and that under Maryland law, no such duty existed under the law of tort or otherwise. Though the district court acknowledged that courts in several other states had recognized that an underlying carrier owes a direct duty of good faith to an excess carrier, the violation of which may be actionable in tort, it refused to hold that the Maryland courts would follow suit.
 
 
 15
 The district court turned finally to Fallon's counterclaim against St. Paul. In that counterclaim, Fallon alleged that St. Paul had breached contractual duties it owed him as an insured under its policy, as well as its general duty of good faith, by denying coverage and refusing to undertake his defense in the Fuegi action--or to help pay for the cost of that defense--until after the partial settlement. For these alleged breaches of duty, he sought to recover compensatory damages of $1 million, including the attorneys' fees he incurred in defending both the Fuegi action and the declaratory judgment action, and punitive damages of $2 million.
 
 
 16
 The district court held that St. Paul was entitled to summary judgment on most of Fallon's counterclaim. The district court reasoned that, under the terms of its policy, St. Paul had no duty either to undertake Fallon's defense in the Fuegi action itself or to help pay for it until after the underlying carriers had exhausted their policy limits. The undisputed evidence established that this did not occur until Hartford and Continental settled with the Fuegi plaintiffs in March of 1989, that St. Paul did in fact assume the defense of Fallon at that point, and that Fallon himself incurred no further legal expenses thereafter. St. Paul was therefore entitled to summary judgment on Fallon's claim that it breached its contractual duty to defend him in the underlying tort case, and Fallon was not entitled to recover from it any attorneys' fees he incurred in defending that action.
 
 
 17
 The district court held, however, that Fallon was entitled to recover from St. Paul the attorneys' fees which he incurred in defending himself against St. Paul's declaratory judgment action. The district court noted that the Maryland courts had recognized an exception to the traditional "American Rule" against recovery of attorneys' fees by a prevailing party, which permitted an insured who prevailed in a declaratory judgment action brought to determine whether its liability insurance policy provided coverage for a particular claim to recover from the insurer the attorney's fees he incurred in litigating that declaratory judgment action, whether it was brought by the insured himself or by the insurer. See Cohen v. American Home Assur. Co., 255 A.2d 255 (Md.1969); Brohawn v. Transamerica Ins. Co., 347 A.2d 842, 850 (Md.1975); Bankers & Shippers Insur. Co. v. Electro Enters., Inc., 415 A.2d 278 (Md.1980); American Home Assur. Co. v. Osbourn, 47 Md.App. 73, 84 (1980). Rejecting St. Paul's argument that the rule announced in these cases had been limited by more recent authority, the district court concluded that they "provided ample precedent for awarding Fallon the attorneys' fees and costs [he] incurred in defending himself against St. Paul's declaratory judgment action." JA 1325.
 
 
 18
 St. Paul appeals the rulings against it.
 
 II.
 
 19
 We have carefully considered the district court's opinion, the written and oral arguments of counsel, and the relevant portions of the record. Having done so, we find no reversible error in the district court's disposition of the various motions and cross-motions for summary judgment. We therefore affirm the district court's judgment for the reasons stated in its opinion. St. Paul Fire & Marine Insur. Co. v. Continental Ins. Co., No. HAR 88-3487 (D. Md. May 12, 1993).
 
 AFFRIMED
 
 
 [1]
 St. Paul proposed placing any funds that it might contribute to settlement into an escrow account pending resolution of the declaratory judgment action
 
 
 [2]
 St. Paul's policy did not obligate it to provide a defense when the insured had other coverage, but it did reserve to St. Paul the right "to enter any ... suit [against the insured] if we want to." JA 358
 
 
 [3]
 St. Paul actually moved to amend its complaint to assert these damages claims before it settled with the Fuegi plaintiffs, but did not obtain leave to do so until after the settlement was consummated
 
 
 [4]
 The provision in question imposed the following obligations on the policyholder and anyone else insured under the policy:
 If anyone makes any claim against you, notify us as soon as possible. If you're sued, send us copies of all suit papers, reports and documents. If we decide to enter the negotiations or suit, help us in any way you can.
 We're not obligated to pay for your loss unless you do all this.
 JA 363 ("What you must do for us") (emphasis added).
 
 
 [5]
 St. Paul had also argued that Fallon's conduct breached a duty of good faith and fair dealing that was implicit in the insurance contract. The district court did not specifically consider whether Fallon had breached this implied duty of good faith, but we think a holding that he did not was implicit in its holding that he did not breach his express duty of cooperation, since the two duties are essentially congruent. See Sargent v. Johnson, 551 F.2d 221 (8th Cir.1977)